IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OMAR PORRATA, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 14-2309 |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA | : | |
| INTERSCHOLASTIC ATHLETIC | : | |
| ASSOCIATION, INC., | : | |
| | : | |
| Defendant. | : | |

Smith, J.                                                                August 14, 2014

## MEMORANDUM OPINION

Presently before the court is the motion for preliminary injunctive relief filed by the plaintiff, Omar Porrata ("Porrata").  As explained below, the court will deny the motion.

### I.  JURISDICTION

The court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

### II.  VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

### III.  PROCEDURAL HISTORY

On April 17, 2014, Porrata commenced this action against the defendant, Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA"), by filing a complaint in the Court of Common Pleas of Northampton County.  *See* Notice of Removal ("Notice"), at Ex. A, Compl., Doc. No. 1-2.  In the complaint, Porrata alleges that Palisades High School employed him as the head coach of its high school wrestling team.  Compl. at ¶¶ 3-5.  On January 30, 2014, the Palisades High School wrestling team was scheduled to wrestle against Bethlehem Catholic High School in the District XI, Class AA team tournament at Catasauqua High School.  *Id.* at ¶ 25.

Instead of wrestling Bethlehem Catholic High School, Porrata decided to forfeit all ten weight-classes for which Palisades High School had entered wrestlers. *Id.* at ¶ 26. Based on this conduct, the District XI Committee later held a hearing after which it determined that Porrata had engaged in unsportsmanlike conduct and imposed sanctions on Palisades High School and Porrata. *Id.* at ¶¶ 37-52. Although Porrata appealed from this decision to the PIAA Board of Appeal, the Board of Appeal generally affirmed the sanctions and expanded one of the sanctions to prohibit any PIAA school employing Porrata as a coach from competing in the 2014-2015 postseason. *Id.* at ¶¶ 56-65.

Based on, *inter alia*, the aforementioned allegations, Porrata asserts causes of action under 42 U.S.C. § 1983 for violations of his due process and equal protection rights under the Fourteenth Amendment to the United States Constitution. *Id.* at 10-12. Porrata also includes causes of action for defamation and for declaratory judgment. *Id.* at 12-13.

On the same date that Porrata filed the complaint, he also filed a petition for preliminary injunctive relief. The Honorable Paula A. Roscioli of the Court of Common Pleas of Northampton County entered a rule to show cause as to why the court should not grant the petition. *Porrata v. Pennsylvania Interscholastic Athletic Ass'n*, No. C-48-CV-2014-3437, Rule to Show Cause, Doc. No. 1-4. Judge Roscioli set the rule returnable date for April 24, 2014. *Id.*

Just two days prior to the rule returnable date on the petition for preliminary injunctive relief, *i.e.* April 22, 2014, the PIAA removed the case to federal court under 28 U.S.C. §§ 1331, 1441, and 1446. Notice at 1. The undersigned held a conference with counsel on April 24, 2014, after which the court entered an order scheduling the matter for an evidentiary hearing on Porrata's request for a preliminary injunction. Doc. No. 4. The court also ordered the parties to provide memoranda of law in support of their respective positions. *Id.*

Porrata filed the instant motion for preliminary injunctive relief and a brief in support of the motion on April 25, 2014.  Doc. Nos. 5, 6.  The PIAA filed a brief in support of its opposition to the motion on April 29, 2014.  The court held an evidentiary hearing on the motion on May 1, 2014.  At the conclusion of the hearing, the court ordered the parties to submit proposed findings of fact and conclusions of law.  Both parties filed proposed findings of fact and conclusions of law on May 12, 2014.

## IV.  FINDINGS OF FACT

After carefully considering the evidence presented during the evidentiary hearing on May 1, 2014 and, after assigning such weight to the evidence as we deemed proper and disregarding the testimony that the court found to lack credibility, the pertinent facts are as follows:

### A. **The PIAA**

1.  The PIAA is a non-profit, membership organization consisting of approximately 1420 public and private schools.  Tr. of Evidentiary Hrg. for Prelim. Inj. ("Inj. Tr.") at 326, 327, Doc. No. 13; Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 2, PIAA Const. art. II, §§ 1, 2, art. III, § 1.

2.  The PIAA oversees interscholastic athletic competitions between its member schools. Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 4, PIAA Const. art. VII.

3.  Approximately 350,000 student-athletes participate in PIAA-sanctioned sports in a given year.  Inj. Tr. at 327.

4.  The PIAA constantly stresses sportsmanship.  Inj. Tr. at 60.

5.  There are a number of schools in Pennsylvania that do not belong to the PIAA.  Inj. Tr. at 327.  Nonetheless, an "overwhelming majority" of the public high schools are members of the PIAA.  *Id.* at 358.

6. The PIAA's purpose is as follows:

> **A.    Health.**
> To organize, develop, and direct an interscholastic athletic program which promotes, protects, and conserves the health and physical welfare of all participants.
> **B.    Education.**
> To formulate and maintain policies that safeguards the educational values of interscholastic athletics and cultivates the high ideals of good sportsmanship.
> **C.    Competition.**
> To promote uniformity of standards in all interscholastic athletic competition.

Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 1, PIAA Const. art. II, § 1; *see* Inj. Tr. at 327.

7.   The PIAA seeks to "promote, protect, and serve the educational values of interscholastic athletics and promote the ideals of good sportsmanship."  Inj. Tr. at 327.

8.   The PIAA is divided into districts to assist with organization, legislation, and administration.  Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 2, PIAA Const. art. V, § 1.

9.   Each PIAA district has a district committee, which maintains "general control within the District over all interscholastic athletic relations and Contests in which a PIAA member school participates, subject to the provisions of the rules and regulations of the Board of Directors."  Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 6, PIAA Const. art. IX, § 3A.

10.   The members of a particular district determine the makeup of each district committee.  Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 5, PIAA Const. art. IX, § 1A.

11.   At all times relevant to this litigation, Robert Hartman ("Hartman") served as the chairman of the PIAA District XI Committee (the "Committee").  *See, e.g.*, Pl.'s Ex. 1, Tr. of Feb. 16, 2014 Dist. XI Comm. Hrg. ("Comm. Hrg. Tr.")  (noting Hartman as chairman of the Committee).

12.   The PIAA district committees have the power to "address alleged violations of the Constitution, By-Laws, Policies and Procedures, and Rules and Regulations of PIAA" and to "fix and enforce penalties, within the District, for violation[s] of the Constitution, and By-Laws, Policies and Procedures, and Rules and Regulations of PIAA, within the limits prescribed by the By-Laws."  Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 6, PIAA Const. art. IX, § 1G, H.

13.   Generally, each district has one representative on the PIAA Board of Directors, which is the administrative and executive body of the PIAA with "general control over all interscholastic athletic relations and Contests in which a PIAA member school participates." Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 3, PIAA Const. art. VI, §§ 1, 2, art. VII, § 1A.

14.   The PIAA Board of Directors has the power "[t]o investigate, request, receive and/or otherwise obtain information (written and/or oral), hear and decide appeals from decisions of . . . District Committees."  Pl.'s Ex. 2 at 4, PIAA Const. art. VIII, § 1G; *see* Pl.'s Ex. 3, PIAA Policies and Procedures at 25, § II (stating that the PIAA Board of Directors and PIAA Board of Appeal has the power to "investigate, hear, and decide appeals from decisions of . . . District Committees").

15.   The PIAA Board of Directors may "fix and enforce penalties for any violation of the Constitution, By-Laws, Policies and Procedures, and Rules and Regulations of PIAA and such other by-laws, policies, procedures, rules, and regulations as it may, from time to time, adopt." Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 4, PIAA Const. art. VII, § 1I.

16.   Dr. Robert A. Lombardi is the executive director of the PIAA.  Inj. Tr. at 325-26.

17.  Dr. Lombardi has served as the executive director for the past two years, and he has worked with the PIAA for the past 26 years.  Inj. Tr. at 326.

18.  As executive director, Dr. Lombardi is responsible for "carrying out policies and procedures of the board of directors, . . . being the supervisory person of [the PIAA's] interscholastic championship contests, registration, and training of sports officials and handling . . . the PIAA headquarters [from] an operational standpoint."  Inj. Tr. at 326.

19.  Dr. Lombardi also serves as the secretary for the Board of Directors.  Inj. Tr. at 334.

20.  The PIAA attempts to follow its Policies and Procedures "very closely."  Inj. Tr. at 342.

### B.  Porrata as Coach of the Palisades High School Wrestling Team

21.  Porrata has worked as a teacher at Liberty High School ("Liberty") in the Bethlehem Area School District for the past ten years.  Inj. Tr. at 19-20, 21.  During that time, he also served as an assistant wrestling coach at Liberty for four years and as the head wrestling coach for Palisades High School ("Palisades H.S.") since 2008.  *Id.* at 20, 21, 60.

22.  Palisades H.S. participates as a PIAA member school in PIAA District XI.  Inj. Tr. at 26.

23.  Prior to Porrata's arrival, Palisades H.S.'s wrestling team had been mired in an extensive losing streak and had gone through multiple coaches.  Inj. Tr. at 21, 160.  Also, out of 14 possible weight classes, Palisades H.S. had only five wrestlers.  *Id.* at 23.

24.  To change the culture of the wrestling program, Porrata began working on building the program by assisting the youth and junior high wrestling programs, which had kids that would eventually attend Palisades H.S.  Inj. Tr. at 23, 26, 161.  In this regard, Porrata assisted with youth and junior high wrestling practices at night after the conclusion of high school

practices.  *Id.* at 24-25, 26.  He also would attend youth and junior high tournaments and matches on weekends.  *Id.* at 25, 26.

25.  Porrata's commitment to the wrestling program was a year-long endeavor.  Inj. Tr. at 24.

26.  Porrata's efforts were very successful, as the Palisades H.S. wrestling team went from finishing in the bottom three in District XI to finishing in the top three two years ago.  Inj. Tr. at 23.

27.  Porrata acknowledges that teaching sportsmanship is an important part of a coach's job.  Inj. Tr. at 60.

28.  Porrata attended the mandatory rules interpretation committee meeting for coaches, which included a presentation about sportsmanship.  Inj. Tr. at 60-61.

29.  In October 2013, Porrata signed a "PALISADES SCHOOL DISTRICT EXTRA DUTY ACTIVITIES CONTRACT" (the "Agreement").  Inj. Tr. at 26, 27, 28; Pl.'s Ex. 10.  The Agreement states in pertinent part as follows:

> The Palisades School District and **Omar Porrata** hereby enter into the following agreement:  Employee agrees to coach **Wrestling Head Coach** [sic] according to . . . the requirements outlined in the section titled "Extra Duty/Extra Pay Program" of the Agreement Between The Palisades School Board and the Palisades Education Association.
>
> . . .
>
> This contract shall terminate in the event that the employee is relieved of outlined responsibilities because of violation(s) of School District Policy(ies) or for cause as set forth by Statute in the School Laws of Pennsylvania.

**[]$6954**

Pl.'s Ex. 10.  As indicated by the Agreement, Palisades paid Porrata $6,954.00 in salary for the 2013-2014 season.  *Id.*; Inj. Tr. at 28, 107, 108.

### C.  The January 30, 2014 Wrestling Match Against Bethlehem Catholic and the Events Leading up to the District XI Committee Hearing

30.   For the 2013-2014 wrestling season, Palisades H.S. was able to field only ten or eleven wrestlers for the fourteen weight classes.  Inj. Tr. at 31.

31.   On January 30, 2014, the Palisades H.S. wrestling team participated in the District XI Wrestling Class 2A team tournament at Catasauqua High School.  *See* Inj. Tr. at 31; Pl.'s Ex. 1, Comm. Hrg. Tr. at 9.

32.   On January 30, 2014, Palisades H.S. participated in two matches, the first against Jim Thorpe High School ("Jim Thorpe") and the second against Bethlehem Catholic High School ("Bethlehem Catholic").  Pl.'s Ex. 1, Comm. Hrg. Tr. at 31.

33.   At approximately 8:37 a.m. on January 30, 2014, Porrata sent a text message to another team's wrestling coach indicating that "[m]y team's hurting, stomach virus all around." Inj. Tr. at 127-28; Pl.'s Ex. 20.

34.   Palisades H.S. won the first match against Jim Thorpe.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 10, 51; Def.'s Ex. 2.

35.   Palisades H.S. wrestlers weighed-in for ten of the fourteen weight classes against Jim Thorpe.  Def.'s Ex. 2; Pl.'s Ex. 1, Comm. Hrg. Tr. at 42.

36.   One of the winning Palisades H.S. wrestlers won his match against Jim Thorpe by forfeit after Porrata had him weigh in to get a forfeit even though he could not actually wrestle because of an injury to his ear.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 36-37.

37.   After Palisades H.S. won against Jim Thorpe, they were scheduled to wrestle Bethlehem Catholic at approximately 7:00 p.m. that evening.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 57.

38.  Porrata had initially planned on using his aforementioned ineligible wrestler to obtain a forfeit at the 195-pound weight class because Bethlehem Catholic did not have a wrestler at this weight class.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 36-37, 47.

39.  Palisades H.S. sent wrestling captains to the pre-match coin toss.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 61.

40.  Despite participating in the coin toss, at Porrata's direction Palisades H.S. forfeited all fourteen weight classes in the match against Bethlehem Catholic.  Inj. Tr. at 31.

41.  Some, but not all, of the Palisades H.S. wrestlers were ill or injured at the time of the Bethlehem Catholic match.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 46.

42.  After each individual wrestler went out to the table to wrestle, Porrata would tell the referee that the team was going to forfeit that particular bout.  Inj. Tr. at 68.

43.  Porrata did not tell the opposing coach, the meet official, or the referee of his plan to forfeit each match.  Inj. Tr. at 65-66, 68, 69, 70.

44.  Porrata did not consider contacting any Palisades H.S. officials about the forfeit.  Inj. Tr. at 130.

45.  No Palisades H.S. official or administrator was present for the match against Bethlehem Catholic.  Inj. Tr. at 81, 235, 283.

46.  The final score of the match between Palisades H.S. and Bethlehem Catholic was 84-0 in favor of Bethlehem Catholic.  Def.'s Ex. 2.

47.  Most of the parents of the Palisades H.S. wrestlers stood and clapped following the forfeiture.  Inj. Tr. at 202, 203.[1]

---

[1] The testimony of Larry Wasser, a parent of one of the Palisades H.S. wrestlers, in which he stated that the parents clapped simply because they were merely following the protocol of every other match, was not credible.  Inj. Tr. at 202.

48. Although some of the Palisades H.S. wrestlers were injured or ill at the time of the Bethlehem Catholic match, Porrata's statement that he forfeited the match in the manner that he did because his team was injured or ill lacks credibility.

49. Porrata does not believe he was acting in an unsportsmanlike-fashion when he did not tell the Bethlehem Catholic coach of his plan to forfeit.  Inj. Tr. at 65, 66.

50. After the forfeiture, Porrata did not discuss what he had done with the press because he was angry at the reporter covering the tournament.  Inj. Tr. at 70, 112; Pl.'s Ex. 1, Comm. Hrg. Tr. at 54-55.

51. Larry Wasser ("Wasser") confronted Bethlehem Catholic's coach after the match. Inj. Tr. at 206.

52. Wasser felt that Bethlehem Catholic had disrespected the Palisades H.S. team when certain wrestlers were out on the mat during warm-ups even though they did not weigh-in.  Inj. Tr. at 199.

53. Wasser also thought that the Bethlehem Catholic coach was disrespectful when he did not get into line to shake hands after the match.  Inj. Tr. at 206.

54. Richard Heffernan ("Heffernan") has served as the principal of Palisades H.S. for the past eleven years.  Inj. Tr. at 234.

55. Heffernan has an extensive background in athletics, which includes his participation as a college football player at Fordham University and his subsequent experience coaching football at the collegiate and high school levels.  Inj. Tr. at 234-35.  In addition, he has served on the Colonial League executive board and served one term as the District XI Committee chairperson from 2008 through 2010.  *Id.* at 235.

56.  On the night of January 30, 2014, Heffernan was on his way to Vermont with his wife and child for an extended weekend.  Inj. Tr. at 235.  During this trip, Heffernan received notice that Palisades H.S. had forfeited the match against Bethlehem Catholic.  *Id.* at 235-36.

57.  Immediately after receiving notice of the forfeit, Heffernan contacted Dr. Bridget O'Connell, superintendent of the Palisades School District, to inform her of what happened during the match.  Inj. Tr. at 236.

58.  Based on his conversation with Dr. O'Connell, Heffernan called Porrata to inquire about the match with Bethlehem Catholic.  Inj. Tr. at 71, 236.

59.  During Heffernan's conversation with Porrata, Porrata informed Heffernan that he had forfeited all matches against Bethlehem Catholic.  Inj. Tr. at 32, 71, 234, 236.

60.  When Heffernan asked Porrata why he forfeited the matches, Porrata told him he did that because Bethlehem Catholic weighed-in their junior varsity wrestlers and it was disrespecting the Palisades wrestlers.  Inj. Tr. at 236.   In addition, Porrata noted that the Bethlehem Catholic wrestlers who were in street clothes were goofing around on the mat prior to the meet, and he was not going to allow the Palisades H.S. wrestlers to be treated like that.  *Id.*

61.  During this conversation with Heffernan, Porrata did not state that he forfeited the match because the team was unable to physically perform because of injury or illness.  Inj. Tr. at 236-37.

62.   Porrata's then-fiancé (and now-wife), Megan Brewington Porrata, overheard Porrata's side of the telephone conversation with Heffernan.  Inj. Tr. at 215-16.

63.  Heffernan had never heard of a team forfeiting a match in a manner similar to the forfeiture against Bethlehem Catholic.  Inj. Tr. at 237.

64. After speaking to Porrata, Heffernan contacted Dr. O'Connell and told her about his conversation with Porrata. Inj. Tr. at 237. Dr. O'Connell then told Heffernan that he should call Porrata and tell him that he is suspended pending a full investigation. *Id.*

65. Heffernan then called Porrata and indefinitely suspended Porrata from his duties as wrestling coach pending a full investigation. Inj. Tr. at 71, 237.

66. Heffernan also called Hartman to apologize for the conduct of the Palisades H.S. wrestling team and coach and to inform him that the school was immediately suspending Porrata pending a full investigation. Inj. Tr. at 32, 238.

67. Rebecca George ("George") has served as the athletic director of the Palisades School District for the past eleven years. Inj. Tr. at 281.

68. During the night after the forfeit, Porrata sent a text message to George, stating: "Sorry for letting you down, I wish you could see it the way I saw it, I will not have my kids treated the way they were tonight, they worked too hard . . . thanks for the opportunity." Def.'s Ex. 1; Inj. Tr. at 79, 80, 113, 114, 282.

69. Because of Palisades H.S.'s forfeiture against Bethlehem Catholic, the Committee scheduled a hearing. Pl.'s Ex. 11.

70. When a district committee schedules a hearing, the 2013-2014 PIAA Policies and Procedures provide in pertinent part as follows:

> In all cases where a hearing is to be held, the . . . District Committee . . . shall send a letter to . . . (1) the Principal of the schools involved, . . . . (3) any adult who may be subject to sanction as a result of findings by the . . . District Committee, advising them of the following:
>
> 1.     The date, time, and place of the hearing.
>
> 2.     How the case arose (by request of the student's school, complaint of another school, or by the Regional Panel or District Committee's receipt of information).

3.      The issue(s) involved, citing the applicable provision(s) of the PIAA Constitution, By-Laws, Policies and Procedures, and/or Rules and Regulations. This should be sufficiently specific to inform the parties of the issues, but sufficiently general to cover collateral issues that may arise (for example, a case arising under the Transfer Rule may be identified simply as involving ARTICLE VI, TRANSFERS, RESIDENCE, AND RECRUITING, of the PIAA By-Laws, but if the precise section or sections are known, they could be identified also).

4.      The fact that the school and any individuals involved, including students, are entitled to bring with them to the hearing any persons whom they desire to attend, to submit any written material which they desire, and to be represented by counsel.  Where any party intends to submit written material, the Regional Panel or District Committee may require that an appropriate number of copies be provided.  If written material has been received by the Regional Panel or District Committee from others, copies shall be provided to the member school.

5.      Any local ground rules for hearings (which may not conflict with these Standards).

6.      That, if the Principal has any questions, that Principal is to contact an identified person (Regional Panel Chairman, District Chairman, District Executive, etc.).

Pl.'s Ex. 3, PIAA Policies and Procedures at 17-18.

71.  Hartman authored a letter dated January 31, 2014, to Heffernan.  Inj. Tr. at 32, 36;

Pl.'s Ex. 11.  This letter states in pertinent part as follows:

Dear Mr. Heffernan:

As a result of the actions of Head Coach Omar Porrata, the District XI Executive Committee is invoking the sanctions, effective immediately, as defined [sic] Article XIII, Penalties, Section 9, Violations by an Individual, Subsection A, Rectifying Actions by a School.  These items can be found on page 29 of the PIAA By-laws.

As Article XIII reads, PIAA District XI will suspend Palisades High School from further PIAA Post-season competition in the sport of wrestling if Head Coach Omar Porrata is not suspended.

Furthermore, we are requesting that Mr. Porrata not be present at the District XI Dual Championship on Saturday, February 1, 2014 at Freedom High School.  We would like to maintain the focus of the event on the student-athletes who are participating.

Additionally, PIAA District XI is requesting a hearing of Palisades High School and Omar Porrata to take place at Tamaqua High School on Sunday, February 16, 2014 at 11:00 a.m.  The PIAA District XI Committee will hear evidence in this matter.

Please confirm that you have read and understand the conditions of this letter. We hope to have a response by 3:00 p.m., Friday, January 31, 2014.

If you have any questions on this matter, please contact Robert Hartman, PIAA District XI Chairman at your earliest convenience.

Pl.'s Ex. 11.

72.  Hartman's January 31, 2014 letter did not cite the provisions, if any, of the PIAA Constitution, By-Laws, Rules and Regulations, or Policies and Procedures that Porrata allegedly violated.  Pl.'s Ex. 11.

73.  At approximately 4:00 p.m., on January 31, 2014, George, even though she was still on maternity leave, called Porrata and informed him that he needed to contact Dr. O'Connell. Inj. Tr. at 81, 283.  She also asked him to call her back after he spoke to Dr. O'Connell.  *Id.* at 283, 284.

74.  Dr. O'Connell read Hartman's letter to Porrata during a phone conversation on January 31, 2014.  Inj. Tr. at 33, 34, 62-63, 85.

75.  The PIAA, through the Committee, did not mail a copy of Hartman's letter directly to Porrata, and, even though Dr. O'Connell read the letter to him on January 31, 2014, he did not see the letter until a meeting with Heffernan on February 6, 2014.  Inj. Tr. at 32, 33-34, 86.

76.  The fact that the PIAA did not directly send Porrata the January 31, 2014 letter did not affect Porrata's ability to defend himself at the District XI Committee hearing.  Inj. Tr. at 86-87.

77.  Porrata understood that the hearing would occur on February 16, 2014.  Inj. Tr. at 87.

78.  After speaking to Dr. O'Connell, Porrata had another conversation with George on January 31, 2014.  Inj. Tr. at 81.

79.  During this conversation, Porrata and George discussed what happened on January 30, 2014.  Inj. Tr. at 283-84.

80.  Porrata told George that Bethlehem Catholic was disrespectful to him, and he would do whatever he could to not have the kids treated the way they were that evening.  Inj. Tr. at 284, 294-95.

81.  During George's conversation with Porrata, he did not mention anything about illness or injury being the reason for the forfeiture.  Inj. Tr. at 284, 295.

82.  Porrata provided George with detailed information about what happened that night, and he told her that Wasser approached him, looked him in the eyes, and told him that his son would not wrestle against Bethlehem Catholic.  Inj. Tr. at 193, 197, 295.

83.  Once Wasser told him that, Porrata decided he was not going to wrestle against Bethlehem Catholic.  Inj. Tr. at 295.

84.  Both Hartman and Dr. Lombardi provided numerous statements to the press in the days immediately following Palisades H.S.'s match with Bethlehem Catholic.  Pl.'s Exs. 4-9; Inj. Tr. at 329.

85.  On January 31, 2014, Ryan Holmes ("Holmes") of The Express Times authored an article titled, "District 11 considers sanctions over Palisades wrestling forfeiting quarterfinal bouts against Bethlehem Catholic."  Pl.'s Ex. 4; Inj. Tr. at 11.  In this article, Hartman stated "'We heard some rumors about this happening a few years back,'" which Holmes stated was in reference to "teams forfeiting to Bethlehem Catholic for nonsanctioned reasons."  Pl.'s Ex. 4; Inj. Tr. at 11.  Hartman also stated as follows:

"We addressed it with the coaches and they knew that there would be serious consequences if it did happen[.] . . .   It's too quick to make any decisions on what happened last night and we can't tell Palisades what to do, but we have requested a hearing to discuss it.   Omar is not our employee.   It's up to the school to handle it."

. . .

"Whether people support his decision or not and whether you like Beca or not, it's a black mark for the sport of wrestling."

Pl.'s Ex. 4.

86.   On January 31, 2014, Holmes authored an article titled, "High school wrestling name-calling ensues after Palisades' 'statement' loss to Bethlehem Catholic."  Pl.'s Ex. 5; Inj. Tr. at 12.  In this article, Hartman stated:

"Athletics is how we learn to fight through things[.] . . . Speaking as the athletic director of Whitehall, that's what we strive for here; to teach our kids and help them grow.   Our coaches do a great job of it here.   It's not an indictment of Palisades at all, but I think it's fair to say that we wouldn't have those coaches here.   Wins and losses are important but learning is the key.   In a roundabout way that should say how I feel about what he did."

Pl.'s Ex. 5; Inj. Tr. at 12-13.

87.   On January 31, 2014, Holmes authored an article titled, "Palisades High School wrestling team to continue in District 11 Class AA team championships."  Pl.'s Ex. 6; Inj. Tr. at 13.  In this article, Hartman stated:   "We are not interested in punishing kids for actions of adults[.] . . . Palisades school district is (Porrata's) employer.   He's not our employee and it's too early to make any decisions."  Pl.'s Ex. 6; Inj. Tr. at 13.

88.   On January 31, 2014, Michael Blouse ("Blouse") authored an article for The Morning Call titled, "Fourteen forfeits:  Pirates abandon ship rather than wrestle Bethlehem Catholic."  Pl.'s Ex. 7; Inj. Tr. at 13.  In this article, Hartman stated: "This absolutely damages

16

the integrity of the sport[.] . . . We need to discuss this as a committee and there may be action taken.  This goes against all the ideals and principles of the PIAA."  Pl.'s Ex. 7; Inj. Tr. at 13.

89.    On January 31, 2014, Blouse and Mark Wogenrich authored an article for The Morning Call titled, "Palisades faces wrestling hearing, can continue in D-11 tourney."  Pl.'s Ex. 8; Inj. Tr. at 14.  In this article, Dr. Lombardi stated that Porrata's decision was "unprecedented." Pl.'s Ex. 8; Inj. Tr. at 14.  Dr. Lombardi also stated that

> "It's an invitational tournament[.] . . . Teams enter the tournament with the understanding that they're going to participate.  By not participating, [Palisades] violated the intent of the tournament.  District 11 is scheduling a hearing for full review with the school's involvement.  I believe the district is handling this appropriately."

Pl.'s Ex. 8; Inj. Tr. at 14-15.  The authors quoted Hartman as saying, "'This stinks for the sport[.] It takes away from the event.  I don't think it's something that wrestling is built on.'"  Pl.'s Ex. 8; Inj. Tr. at 14.  The authors also stated that "Lombardi and Hartman said Bethlehem Catholic's classification should not be considered an explanation for Porrata's decision to forfeit."  Pl.'s Ex. 8; Inj. Tr. at 15-17.  Dr. Lombardi further stated:   "That has no bearing on going out and wrestling an opponent you're scheduled to wrestle[.] . . . If there are other issues separate from the process, teams can address them.  So that's not germane here."  Pl.'s Ex. 8; Inj. Tr. at 17.

90.    Dr. Lombardi informed the press that this was an unprecedented event because the PIAA had never had a team forfeit all of its bouts and "walk off a court."  Inj. Tr. at 329.

91.    On February 1, 2014, Blouse authored an article titled, "District 11 penalizes Palisades wrestling coach over forfeit."  Pl.'s Ex. 9; Inj. Tr. at 17-18.  In this article, Blouse quoted Dr. Lombardi as saying that Porrata's decision "violated the intent of the tournament." Pl.'s Ex. 9; Inj. Tr. at 18.  In addition, the article quoted Hartman as saying "Article 13, Section 9

of the PIAA bylaws deals with possible penalties when provisions are put in place[.]   This penalty was part of those provisions."  Pl.'s Ex. 9.

92.   Dr. Lombardi indicated that Porrata's decision "violated the intent of the tournament" because it was an invitational tournament with an understanding that the teams that go into it will participate.  Inj. Tr. at 340-41.

93.   Since Palisades H.S. did not participate in the match with Bethlehem Catholic, Dr. Lombardi believes that Porrata violated the intent of the tournament to participate in the tournament with his team.  Inj. Tr. at 341.

94.   On February 1, 2014, Palisades H.S., under the direction of assistant coach Ricky Bass, wrestled against Catasauqua High School.  Inj. Tr. at 204-05; Pl.'s Ex. 1, Comm. Hrg. Tr. at 10, 37; Def.'s Ex. 2.

95.   Porrata believes that all ten Palisades H.S. wrestlers participated in the match against Catasauqua High School.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 37.

96.   On February 2, 2014, Porrata and George exchanged text messages during which Porrata asked George if he could explain his side of the story to the newspapers.  Inj. Tr. at 117, 296; Pl.'s Ex. 19.

97.   George advised him that he should not talk to the media.  Inj. Tr. at 117; Pl.'s Ex. 19.

98.   George also told Porrata that "I need you to know that I do not support what you did even though I understand why u did it, but I DO support you as our coach, and will do what I can to help protect the program."  Inj. Tr. at 117-18, 296-97; Pl.'s Ex. 19.

99.   Despite disapproving of what Porrata did, George supported him as the coach because he had done so much for the Palisades H.S. wrestling program.  Inj. Tr. at 310.

100.  George did not believe that the media was stating that Porrata forfeited because Bethlehem Catholic had disrespected him or Palisades H.S.; instead, she felt that the media was portraying that he was trying to make a statement against Bethlehem Catholic.  Inj. Tr. at 297.

101.  When Porrata indicated to George in his text message that he wanted to tell the media "his part" of the story, George believed that Porrata wanted to tell the media that Bethlehem Catholic had disrespected the Palisades H.S. student-athletes.  Inj. Tr. at 297-98.

102.  Hartman authored a second letter, dated February 4, 2014, to Heffernan, in which he stated, *inter alia*, that (1) the hearing was scheduled for February 16, 2014, at 11:00 a.m. at the Tamaqua Area Middle School, (2) the hearing was related to the "actions of Palisades High School and its wrestling coach, Omar Porrata," (3) the hearing would "proceed pursuant to the 'Procedural Standards for Regional Panels and District Committees' as set forth on pages 15 to 24 of the Policies and Procedures Section of the 2013-14 PIAA Handbook, which is available on the PIAA Web site at www.piaa.org[,]" (4) if Heffernan needed to reschedule the hearing or if he had any questions, he should immediately contact Hartman, and (5) Palisades and Porrata were entitled to "have present at the hearing any persons whom they desire, to pretty [sic] any written material that they desire, and to be represented by counsel." Pl.'s Ex. 12.

103.  Although Hartman and the PIAA did not provide Porrata with a copy of the February 4, 2014 letter, Heffernan provided Porrata with a copy of the letter during a meeting on February 6, 2014.  Inj. Tr. at 34-36.

104.  Hartman's February 4, 2014 letter did not cite the provisions, if any, of the PIAA Constitution, By-Laws, Rules and Regulations, or Policies and Procedures that Porrata allegedly violated with his conduct on January 30, 2014.  Inj. Tr. at 344-45.

105.  Hartman's February 4, 2014 letter did not reference the potential penalties that the Committee could impose.  Pl.'s Ex. 12.

106.  Hartman's February 4, 2014 letter mistakenly described the February 16, 2014 hearing as an "appeal" hearing.  Pl.'s Ex. 12.

107.  On February 6, 2014, Porrata had a meeting with Heffernan and Don Hericle ("Hericle").  Inj. Tr. at 246, 248.

108.  During this meeting, Porrata told Heffernan that the Palisades H.S. wrestlers were sick or injured and he forfeited the match against Bethlehem Catholic on January 30, 2014 because of his wrestlers' illnesses and injuries.  Inj. Tr. at 246.

109.  Until this February 6, 2014 meeting, Porrata had not told Heffernan that he forfeited the match against Bethlehem Catholic because the Palisades H.S. wrestlers were ill or injured. Inj. Tr. at 246.

110.  Porrata's reference to injury or illness being the main reason for the forfeit was "a total left turn" from his prior conversations with Heffernan.  Inj. Tr. at 249.

111.  Porrata also informed Heffernan that (1) Palisades H.S.'s wrestlers were unhappy that Bethlehem Catholic weighed-in junior varsity wrestlers, (2) Palisades H.S. was pretty beat up with no backups, (3) he told some of the wrestlers that they were going to rest that night, (4) he decided that six additional wrestlers were not going to wrestle despite those wrestlers having wrestled earlier that day, (5) he did not know if the additional wrestlers got hurt during the prior wrestling match, (6) Bethlehem Catholic was warming-up wrestlers who were not actually wrestling, which he felt was demeaning and angered him, (7) certain parents, including Mr. Marsh, Wasser, and Mr. Gretzinger, came up to him to let him know that they saw the other

20

wrestlers warming-up and they did not want their kids wrestling junior varsity kids, and (8) the coach of Bethlehem Catholic did not shake his hand following the match.  Inj. Tr. at 247-48.

112.  Porrata further indicated that this became a bigger issue than he thought it would and if a similar situation happened in the future, he would contact George or Hericle.  Inj. Tr. at 248.

113.  During this meeting, Heffernan and Hericle also briefly discussed the Committee hearing with Porrata.  Inj. Tr. at 254.  They explained to him that it was a "very serious situation" because of the unsportsmanlike conduct and the Committee could potentially impose sanctions. *Id.* at 254-55.  When they attempted to question Porrata, he became "a little agitated," so they stopped questioning him.  *Id.* at 255.

114.  Heffernan told Porrata that he had only a limited period of time to present – only 45 minutes – so he would want to choose his witnesses wisely.  Inj. Tr. at 255.

115.  Heffernan did not tell Porrata that he could bring only one witness to the hearing. Inj. Tr. at 255.

116.  Prior to the Committee hearing, Heffernan and Dr. O'Connell had scheduled a meeting with Porrata's attorney, Darrell Martoccio ("Martoccio"), for February 11, 2014.  Inj. Tr. at 255; *see also* Pl.'s Ex. 1 (showing Martoccio as Porrata's attorney).

117.  During this meeting, Heffernan and Dr. O'Connell were planning on answering any questions Martoccio had, and they were also going to discuss the Committee hearing.  Inj. Tr. at 255-56.

118.  This meeting never occurred because Martoccio canceled the meeting.  Inj. Tr. at 256.

119.   Although it is unclear when, at some point prior to the Committee hearing on February 16, 2014, Porrata requested and George provided him with a copy of the PIAA Policies and Procedures pertaining to the hearing.  Inj. Tr. at 89.

120.   Porrata claims he did not review the PIAA Constitution or By-Laws before the Committee hearing occurred.  Inj. Tr. at 63-64.

121.   Prior to the Committee hearing, Porrata conversed with one of his wrestler's parents, Eric Gretzinger ("Gretzinger").   Through this conversation, Gretzinger knew that the hearing was focused on the events of January 30, 2014.  Inj. Tr. at 169.

122.   Porrata and Gretzinger discussed why Porrata was getting sanctioned, and Porrata expressed his fear that the Committee would impose additional sanctions.  Inj. Tr. at 170.

123.   On February 12, 2014, Heffernan and Karl Scheibenhofer ("Scheibenhofer"), the assistant principal at Palisades H.S., met with Porrata.  Inj. Tr. at 72, 244.

124.   During this meeting, Heffernan informed Porrata that Palisades H.S. was suspending him for the remainder of the season, which included the District XI wrestling tournament, regionals, and states.  Inj. Tr. at 72, 244-45.

125.   Palisades H.S. permitted Porrata to continue to coach the wrestlers for practice because not having him coach practice would have had a detrimental effect on the athletes insofar as they were at the end of the season.  Inj. Tr. at 245.

126.   Heffernan explained that Palisades H.S. suspended Porrata because of his dishonesty, and the school wanted to "take a strong stance to show District XI that we were acting and putting sanctions upon our coach so that our student athletes would remain eligible to compete through the remainder of this season and beyond."  Inj. Tr. at 245.

127.   Regarding the dishonesty, Heffernan noted that Porrata did not communicate anything about the athletes being sick or injured until nearly a week after the event took place. Inj. Tr. at 246.

128.   Heffernan understood that the Committee was meeting to "determine whether or not the actions of our coach and our wrestling team were unsportsmanlike" on January 30, 2014.  Inj. Tr. at 257.

129.   Porrata understood that what transpired with the forfeiture on January 30, 2014 was the subject of the hearing.  Inj. Tr. at 87.

### D.  The District XI Committee Hearing on February 16, 2014

130.   On February 16, 2014, the Committee held a hearing at Tamaqua Area Middle School.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 1.

131.   Regarding the procedure of the hearing, the PIAA's Policies and Procedures provide that, *inter alia*:

> **G.**     Consistent with the maintenance of an orderly and informative hearing, the manner of presentation of a school's case shall be as chosen by the Principal or the Principal's designee.
>
> 1.     While the manner of presentation may involve formal trial-type proceedings in which witnesses are called and asked questions, to the more informal and common situation where witnesses are simply given the opportunity to present their evidence is usually more effective.
>
> 2.     Reasonable cross-examination of witnesses is permitted.   Cross-examination may be conducted by one representative of any party, such as a school's principal, or the school's counsel, and by a student or the student's counsel or parent.
>
> 3.     Any person in attendance other than representatives of the Regional Panel or District Committee hearing the matter, is subject to questioning by a school, party, member of the Regional Panel or District Committee, counsel for the Regional Panel or District Committee, or other person so authorized by the chair.

4.      Counsel cannot reasonably expect formal rulings on legal objections in the context of the hearing.   However, if a Principal or counsel interposes an evidentiary objection, those having to do with relevance of the testimony and repetitiveness of the testimony may be sustained.   Other objections (most often, hearsay) may be ruled on by the presiding officer, but may also be noted and considered during deliberations.   The presiding officer also has the authority to control issues of relevance and repetitiveness even in the absence of any objection.

5.      Approach to hearsay generally:   Hearsay, as a general matter, is testimony, affidavits, statements, and/or other documents which relay what another person, not present to be cross-examined at the hearing, previously said about something that is now relevant to the proceeding.   Because other parties and the decision makers do not have an opportunity to question the person making the statement(s), the evidence should not be relied upon unless there are strong indicia that the information is reliable.   Unsubstantiated rumors in particular are unreliable.   There are several situations in which hearsay can be used or relied upon by the decision makers:

      a.      If the alleged speaker is present for the hearing and can be questioned about it, the hearsay may be admitted.   Also, if the adverse party admits to the accuracy of the statement, it can be admitted as well.

      . . .

      b.      The hearsay may be used, even if not relied on in the decision, to question other witnesses.

      . . .

      c.      School, business, medical, and governmental records, if prepared in the normal course of the entity's operations, can be admitted and relied upon.

      . . .

      d.      Documents that have indicia of reliability. . . .

      . . .

      e.      The hearsay may be used to explain why someone did something.

      . . .

      f.      The hearsay is not being offered for its truth.

. . .

     G.     Statements of a party whose interest is at issue.

Pl.'s Ex. 3, PIAA Policies and Procedures at 21-22.

132.   As to the length of the hearing, the PIAA's Policies and Procedures state that "[p]resentations at the hearing should be limited to no more than forty-five (45) minutes per party, including questions to adverse witnesses. . . . Absent showing of exceptionally good cause, a party will not be permitted an extension of more than fifteen (15) minutes."  Pl.'s Ex. 3, PIAA Policies and Procedures at 22.

133.   Regarding deliberations following the hearing, the PIAA's Policies and Procedures provide in pertinent part as follows:

> **C.**    The Regional Panel or District Committee shall base its decision only on the evidence, written and oral, presented to it.  Uncorroborated information in newspaper articles and anonymous correspondence is not considered evidence (although it may serve as a basis for questions during the hearing).
>
> . . .
>
> **E.**    Members of the Regional Panel or District Committee who are employed by the school district (not just the individual school) involved, and any other members who have a conflict of interest, shall not be present during deliberations nor vote on the matter.  This provision, as it applies to the school district, is not applicable to Districts VIII and XII.

Pl.'s Ex. 3, PIAA Policies and Procedures at 23-24.

134.   Regarding notification of a district committee decision, the Policies and Procedures state that "[t]he Principal of the school(s) involved, . . . and all adults who were subject to sanction at the hearing shall be notified of the decision by letter (the "Decision Letter").  Where it is local practice to notify the Principal of the decision by telephone, that Principal shall be informed that the decision will be confirmed by letter."  Pl.'s Ex. 3, PIAA Policies and

Procedures at 24.  Also, "[t]he Decision Letter shall identify the date of the hearing or other consideration and the rule(s) under which the decision was made, shall give a brief description of the reason(s) for the decision, and shall advise the recipients of appeal rights."  *Id.*  Further "[a] copy of the Decision Letter shall be provided to any counsel involved, and to any other parties." *Id.*

135.  18 members of the Committee were present for the hearing on February 16, 2014. Pl.'s Ex. 1, Comm. Hrg. Tr. at 1-3.

136.  Heffernan and George were present for the hearing on behalf of Palisades H.S. Pl.'s Ex. 1, Comm. Hrg. Tr. at 4.

137.  Porrata was present and he had Martoccio and Gretzinger with him.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 4; Inj. Tr. at 54-55, 87.

138.  Although Martoccio is an attorney, he was working as a teacher at Council Rock South High School at the time of the hearing.  Inj. Tr. at 52.

139.  Porrata did not pay Martoccio for his services.  Inj. Tr. at 52.

140.  Shortly after the introduction of the participants at the hearing, Hartman, who was presiding over the hearing, announced that the Committee convened the hearing

> in regards to the allegations of misconduct on the part of Palisades head wrestling coach, Omar Porrata[,] and mandatory penalties imposed upon Palisades High School for the conduct of Mr. Porrata alleged to have occurred on Thursday, January 30, 2014, at Catasauqua High School during the District 11 Wrestling Duals Championship.

Pl.'s Ex. 1, Comm. Hrg. Tr. at 4.

141.  Hartman also described the primary issues of the hearing as (1) whether Palisades or Porrata "violated any provisions of the PIAA Constitution and By-laws by intentionally

forfeiting 14 bouts in a District Championship tournament match," and (2) if so, the appropriate penalties for the violation.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 4-5.

142.  Hartman indicated that the hearing would proceed pursuant to the PIAA Procedural Standards for District Committees, and he allowed Palisades and Porrata 45 minutes to present any evidence in support of their positions.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 6.

143.  In his introduction, Hartman did not identify (1) the provisions of the PIAA Constitution, By-Laws, Policies and Procedure, or Rules and Regulations that the Committee charged Porrata with violating, or (2) the potential sanctions that the Committee could impose for any violations.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 4-5.

144.  On behalf of Palisades H.S., Heffernan informed the Committee that Palisades H.S. "will not speak on behalf of Mr. Porrata[, and] Mr. Porrata and his legal counsel do[] not speak on behalf of the district."  Pl.'s Ex. 1, Comm. Hrg. Tr. at 7.

145.  Heffernan then read a written statement into the record.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 7-12.

146.  In this statement, Heffernan indicated in pertinent part, as follows:

> On Thursday, January 30th, during the District XI Class 2A team tournament quarterfinal-round, the Palisades wrestling team, under the direction of Omar Porrata, forfeited all weight classes without the knowledge or consent of the athletic director or other Palisades Administrators.

> As previously noted, the district would support the coach in forfeiting an individual weight class if the student-athlete who earned the spot was injured, ill, academically ineligible or on behavioral suspension.

> However, based on the Palisades wrestling team's first round victory over Jim Thorpe and the fielding of a team within 48 hours against Catasauqua, full team injury, illness, academic ineligibility or behavioral suspension cannot justify the wrestling team's failure to compete.

> Through observation, conversation, and parent and student feedback, we believe Mr. Porrata is a skilled technical coach, passionate about the sport of

wrestling and cares about the wrestling program and its athletes in the Palisades School District.

However, in that moment of decision making in which he led his wrestlers to forfeit all weight classes, Mr. Porrata forced student-athletes to break with the philosophy of the Palisades Athletic Handbook and the Athlete's Pledge which notes:

Any failure to live up to the Palisades School Policies, Palisades Athletic Policies, or the rules and regulations set forth by the PIAA will result in an appropriate consequence deemed necessary.

Pl.'s Ex. 1, Comm. Hrg. Tr. at 9-10.

147.  Heffernan went on to state that the Palisades School District was concerned with minimizing the sanctions against its student-athletes.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 10.  As such, Palisades H.S. suspended Porrata in the consolation match against Catasauqua on February 1, 2014, and it suspended him from the bench for all remaining PIAA wrestling competitions, including the state competition.  *Id.* at 11.  Palisades H.S. did allow Porrata to continue to coach students in practice because the school felt that removing him would have significantly affected the athletes' performance.  *Id.*

148.  In addition to suspending Porrata, Heffernan informed the Committee that Palisades was self-imposing sanctions consisting of (1) reimbursing District XI for approximately $250 that it had to reimburse to fans who paid to see Palisades H.S. wrestle Bethlehem Catholic but were unable to do so because of the forfeit, (2) assigning an on-site administrator to be present for all post-season games and tournaments, and (3) working with the Committee to reach a resolution that would not exclude Palisades H.S. student-athletes from participation in the PIAA. Pl.'s Ex. 1, Comm. Hrg. Tr. at 11-12.

149.  After Heffernan completed reading his statement to the Committee, Porrata presented his side of the case.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 12.

150.   Martoccio began by presenting a lengthy oral statement on Porrata's behalf.   Pl.'s Ex. 1, Comm. Hrg. Tr. at 12-23.

151.   During this statement, Martoccio explained that Porrata did not attempt to take a stand against Bethlehem Catholic.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 13.  Instead, he was attempting to protect his wrestlers because they were having assorted health issues and had not performed well in the prior match.  *Id.* at 13, 17-18.

152.   Martoccio referenced that the Committee was accusing Porrata of "flagrant misconduct."  Pl.'s Ex. 1, Comm. Hrg. Tr. at 13.

153.   Martoccio also stated that Porrata essentially made two mistakes:  First, he did not withdraw the entire team from the tournament when his team started to show symptoms of being unhealthy; and, second, he did not try to find a tournament director to explain the situation.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 18-20.

154.   Despite acknowledging those mistakes, Martoccio argued that those mistakes did not violate PIAA rules.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 20.

155.   Porrata then presented Gretzinger's testimony.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 26-27.

156.   Gretzinger informed the Committee that he is a parent of one of the Palisades H.S. wrestlers, and he discussed his observations of what happened with the match against Bethlehem Catholic.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 26-27.

157.   Gretzinger believed that Porrata "was looking out for the best interest of the[] kids," because the team "was nicked up."  Pl.'s Ex. 1, Comm. Hrg. Tr. at 28.

158.   Gretzinger also indicated that his opinion was "also the consensus by virtually all of the high school wrestling parents that [he] talked to.  And every parent also backs [Porrata's] decision for that Thursday night."  Pl.'s Ex. 1, Comm. Hrg. Tr. at 28-29.

159.   Gretzinger presented the Committee with three letters from the families of Palisades H.S. wrestlers in which the families described the health issues affecting their children and some of the other wrestlers that day.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 29; *see* Inj. Tr. at 164.[2]

160.   The conclusion of Porrata's presentation before the Committee consisted of Martoccio setting forth his position on Porrata's actions and suggesting that the Committee not impose any further sanctions.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 33-36.

161.   After Martoccio finished his presentation, various Committee members began to question Porrata and Heffernan.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 36-68.

162.   During this questioning, some Committee members referenced potential facts that were not part of the testimonial record at the time.[3]

163.   For example, the first member to question Porrata was Committee member Elaine Arnts ("Arnts").  Pl.'s Ex. 1, Comm. Hrg. Tr. at 36.

164.   Arnts asked Porrata why he went "through the warm up and coin toss if [he] didn't have any intent of wrestling the match?"  Pl.'s Ex. 1, Comm. Hrg. Tr. at 36.  At the time, no one had presented evidence that Palisades H.S. had gone through the warm up and coin toss.

---

[2] Gretzinger also referenced a statement from a parent of children participating in the youth and middle school programs.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 30.  This parent presented the statement during a then-recent Palisades School Board meeting.  *Id.*  It is unclear from the transcript of the hearing whether Gretzinger presented the written statement to the Committee; however, as discussed later in this opinion, the statement was included in the packet the PIAA Board of Appeals provided to Porrata and his counsel.  *See* Def.'s Ex. 2.

[3] It is unclear what information the Committee had, if any (or how it would have obtained any information), prior to the hearing.  In Hartman's February 4, 2014 letter, he indicated that Palisades H.S. would not have to provide the Committee with documentation that it had already provided to "the District Committee."  *See* Pl.'s Ex. 12.  Since there was no testimony at the Committee hearing as to what documentation it already had, if any, the court cannot discern whether the Committee had any information before it at the start of the hearing.

165.   Porrata answered Arnts' question by indicating that he had taken one of his wrestlers, who could not actually wrestle because of his ear, and had him weighed in just to get a forfeit because Bethlehem Catholic did not have a wrestler at this individual's weight class.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 36-37.

166.   Another Committee member, Thomas Moll ("Moll"), asked Porrata questions about whether his ten wrestlers had wrestled in three matches: one on Monday, one on Thursday against Jim Thorpe (the meet prior to the Bethlehem Catholic match), and one on Saturday.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 37.  Once again, no one had introduced evidence about a match on the Monday preceding the Bethlehem Catholic match.

167.   Porrata answered Moll's question by stating that he believes all ten wrestlers had participated in each of those matches.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 37.

168.   Porrata informed the Committee that if he was in charge of the Saturday, February 1, 2014 match against Catasauqua High School, he "probably would not have wrestled" on Saturday.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 37.

169.   Moll asked Heffernan when he first learned that Porrata did not wrestle against Bethlehem Catholic because of illness or injury.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 38.

170.   Heffernan told the Committee that Porrata did not mention illness or injury when they spoke on the evening of January 30, 2014, and the first time Porrata mentioned illness or injury was during a meeting on February 6, 2014.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 38, 54.

171.   Moll stated that he was in attendance at the meet between Bethlehem Catholic and Palisades, and he stated that "I have to say I find it odd that your parents would have reacted the way they did if the match was lost due to illness and injury, by standing up and giving a standing

ovation.  I only would have deemed that response as a result of making a statement."  Pl.'s Ex. 1, Comm. Hrg. Tr. at 39.[4]

172.  Heffernan informed the Committee that he did not have any documentation indicating that the student-athletes were absent from school due to health reasons.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 39.

173.  Heffernan also informed the Committee that during a meeting with the assistant principal on January 31, 2014, nine of the ten wrestlers showed up for that meeting.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 40.

174.  Porrata stated that he realized during the Jim Thorpe match that his team probably should not be wrestling that day.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 42-43.

175.  Porrata stated that probably eight of the ten kids could not wrestle.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 46.

176.  Nonetheless, Porrata admitted that he weighed-in a wrestler that was not cleared to wrestle to get a forfeit against Jim Thorpe.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 47.

177.  Scott Dimon ("Dimon"), another Committee member, challenged Porrata's statement that he was concerned about one of his athletes, named "Donnelley", who was allegedly fighting the flu and losing weight.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 42-43, 47, 48.

178.  Dimon noted that Donnelley had won his match against Jim Thorpe, and he wrestled on Saturday against Catasauqua High School.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 47, 48.  The transcript of the Committee hearing does not reflect when Donnelley's result against Jim Thorpe was previously introduced into the record.

---

[4] Upon hearing Moll's statement, Hartman indicated that "[t]hat's not really a question."  Pl.'s Ex. 1, Comm. Hrg. Tr. at 39.

179.  Porrata informed the Committee that he failed to contact any of his administrators about his concerns about not participating in the match against Bethlehem Catholic.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 48.

180.  Hartman also referenced information not brought up during the prior testimony in the hearing.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 48-50.

181.  For example, Hartman asked whether Porrata knew about Wasser confronting Bethlehem Catholic's coach immediately after the match.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 48, 49.

182.  Hartman also stated that Wasser called him the next day, and even though Wasser's son had an alleged hip injury, he did not mention his son's injury.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 50.  During this conversation, Wasser mentioned his disdain for Bethlehem Catholic to Hartman.  *Id.* at 50.

183.  Hartman further stated he received two or three e-mails from Palisades parents, none of which addressed injury or illness and all of which addressed disdain for Bethlehem Catholic.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 50.

184.  Dennis Nemes ("Nemes"), another Committee member, stated that Palisades H.S. had six of its wrestlers pin their opponents and three of its wrestlers have major decisions against their opponents in the Jim Thorpe match.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 51.

185.  Nemes referenced the short times of some of the matches as demonstrating Palisades H.S.'s stellar performance against Jim Thorpe.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 51.

186.  Porrata informed the Committee that Palisades H.S. wrestlers dominated the match against Jim Thorpe because Jim Thorpe was an inferior opponent.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 51.

187.  At one point, in support of his contention that his wrestlers were ill and injured, Porrata attempted to state that some of his wrestlers went straight from the mat to the locker room because of illness.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 52.

188.  Nemes somewhat rebuffed this statement by explaining that he was at the match with Bethlehem Catholic and although he could not say that it did not happen, he did not see any wrestlers go straight from the mat to the locker room.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 52. Nonetheless, through his "personal observations," Nemes felt the Palisades H.S. wrestlers "looked pretty healthy to [him]" and the results of the Jim Thorpe match showed they were healthy.  *Id.*

189.  Porrata told the Committee about his prior history with a Morning Call reporter to whom he refused to comment to after the match.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 54.  Porrata indicated that he did not comment to the press because he "didn't think it was a huge deal."  *Id.* at 55.  He also stated that he contacted George about whether he could talk to the press, and she told him he should not.  *Id.*

190.  Porrata told the Committee that he did not attend a meeting that occurred between Hartman and some other coaches to address concerns with teams forfeiting against Bethlehem Catholic.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 56.

191.  Ray Kinder, secretary of the Committee, stated that people are not happy with Bethlehem Catholic, and that other coaches have discussed forfeiting against them.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 58-59.

192.  Porrata indicated that he realized that he created a situation when the team was forfeiting, and he was going to talk to Bethlehem Catholic's coach after the match to explain to

him what happened, but the coach refused to come out and shake hands with him and his team. Pl.'s Ex. 1, Comm. Hrg. Tr. at 59.

193.   At that point, Porrata was "really angry that [the coach] didn't even acknowledge my team." Pl.'s Ex. 1, Comm. Hrg. Tr. at 59.  Thus, Porrata did not talk to the press because he was afraid to speak emotionally and speak badly about Bethlehem Catholic.  *Id.*

194.   Dave Troxell ("Troxell"), another Committee member, inquired why, if Palisades was suffering from illness and injury, did Porrata and two of the student-athletes stay and watch the match between Catasauqua and Northern Lehigh.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 60.

195.   Porrata responded to Troxell by stating that most of the players went home with their parents, and he was there with the only two players that took the bus.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 60.

196.   Porrata indicated that his team did not warm up for the Bethlehem Catholic match. Pl.'s Ex. 1, Comm. Hrg. Tr. at 60-61.  There was a coin flip, and he sent the captain out for the coin flip.  *Id.* at 61.  At that time, Porrata did not tell anyone that his team was not feeling well and they were going to forfeit.  *Id.*  Porrata may or may not have been still deciding whether the team was going to forfeit when his players went to the coin flip.  *Id.* at 62-65.

197.   Heffernan told the Committee that Palisades H.S. was allowing Porrata to run the wrestling program, but he was not able to be on the bench or at a facility where a match was taking place.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 66.

198.   Porrata stated that he had asked his assistant coach not to wrestle in the match on Saturday, but the assistant coach told him that the kids did not want to forfeit and they wanted to wrestle for Porrata.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 66-67.

199.  Heffernan did not explain to the Committee the reasons that Porrata had previously given to him about why he forfeited because Palisades H.S. had decided that it was more of a personnel matter.  Inj. Tr. at 250, 260-61.

200. Palisades H.S. administrators intentionally did not provide the Committee with additional information regarding their investigation into Porrata's actions.   Inj. Tr. at 250. Instead, Palisades H.S.'s administrators prepared a statement that the School Board had reviewed, and the administrators had decided to read the statement and wait to answer any questions by the Committee.  *Id.*  They felt the statement would benefit the kids and show that Palisades H.S. was taking a strong stance against unsportsmanlike behavior.  *Id.*

201.  Heffernan did not directly tell the Committee that Porrata had lied to them.  Inj. Tr. at 258.

202.  George did not tell the Committee about her conversation with Porrata on January 31, 2014, during which he stated that Bethlehem Catholic had disrespected Palisades H.S.  Inj. Tr. at 286.

203.   George explained that she attended the hearing because she was the athletic director, and she wanted to know what was happening.  Inj. Tr. at 286.

204.   Similar to Heffernan, George did not want to offer any information relating to personnel matters at the hearing.  Inj. Tr. at 286.

205.   At the conclusion of the hearing, the Committee determined that Porrata had committed unsportsmanlike conduct.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 68.

206.  The Committee then orally announced the sanctions against Porrata and Palisades H.S.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 69.

207.   After announcing the sanctions, Hartman informed Porrata, Martoccio, and Heffernan that if they chose to appeal, they had 30 days to submit an appeal.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 71.  In addition, Hartman told Porrata that he and Martoccio could appeal by writing to Heffernan, who would then relay the appeal to the PIAA.  *Id.*

208.  At no point during the Committee hearing did Porrata or Martoccio object to the proceeding, to the notice provided, to any testimony or questioning, or to the issues presented for consideration.  Pl.'s Ex. 1.

209.  Dr. Lombardi believes that the PIAA Policies and Procedures applicable to district committee hearings were followed at the Committee hearing.  Inj. Tr. at 346.  Nonetheless, Dr. Lombardi acknowledges that there were some comments during the hearing that did not meet the standard of appropriateness.  *Id.* at 354.

### E.   The Committee's Findings and Determinations

210.  Via letter dated February 18, 2014, Hartman notified Heffernan of the Committee's findings and determinations relating to Porrata's conduct on January 30, 2014.  Pl.'s Ex. 13.  The Committee voted 17-0 that Palisades H.S. and Porrata engaged in "unsportsmanlike actions in direct violation of the purposes of PIAA," which subjected Palisades H.S. and Porrata to certain penalties as provided by ARTICLE XIII, PENALTIES, Section 9.  *Id.*  The Committee also determined that Porrata "willfully, and without good cause, required his Team to forfeit a District-scheduled Contest with an opponent."  *Id.*  Thus, the Committee concluded that consistent with "ARTICLE XII, Section 5, Cancellation of Contract or Failure to Honor District Schedule," Palisades H.S. was subject to any of the penalties described in ARTICLE XIII, PENALTIES, Sections 2 through 7.  *Id.*

211.  The Committee unanimously voted to impose the following penalties:

1.  Palisades School District's suspension of Coach Porrata for the remainder of the 2014 wrestling postseason is accepted.  This suspension shall remain in effect throughout the remainder of the 2014 PIAA wrestling regular season and postseason.  Any participation by him during this period will result in Palisades being removed immediately from any participation in the 2013-14 PIAA postseason competition (i.e. District XI playoffs and PIAA Inter-District playoffs).

2.  ARTICLE XIII, PENALTIES, Section[] 6, Public Censure, of the PIAA By-Laws, defines Public Censure as "intended to manifest strong disapproval of the actions which led to the imposition of this penalty, and is effected through is [sic] inclusion in the decision letter."

Omar Porrata is publicly censured for this unsportsmanlike conduct in the incident on January 30, 2014.

3.  ARTICLE XIII, PENALTIES, Section 7, Probation, of the PIAA By-Laws, defines probation as []an intermediate penalty which may be imposed:

1.  upon a finding of a violation of the Constitution, By-Laws, Policies and Procedures, and/or Rules and Regulations of the PIAA,
2.  to ensure that steps are taken by schools to minimize the risk of future violations by a school of the Constitution, By-Laws, Policies and Procedures, and/or Rules and Regulations of PIAA, and/or
3.  to address deficiencies in administrative oversight of the interscholastic athletic program at a school.

Palisades School District is hereby placed on probation, said probationary period to continue until the end of the 2014-2015 school year with the condition that the Principal or his designee shall be present at all PIAA District XI playoff Contests, as required by the PIAA District XI Committee.

4.  ARTICLE XIII, PENALTIES, Section 9, Violations by Individuals, Sub-section A., Rectifying Actions by School, the following actions was [sic] taken:

Palisades High School is to direct Omar Porrata not to attend any PIAA District XI wrestling contests for the remainder of the 2013-14 wrestling postseason.

5.  Pursuant to ARTICLE IX, DISTRICT COMMITTEES, Section 3, Powers and Duties of a District Committee, to protect PIAA member schools and to convey the Committee's determination that the conduct of Coach Porrata was knowingly unsportsmanlike and directly contrary to the purposes of PIAA, effective immediately and ending at the conclusion of the 2015 PIAA Wrestling

Championships, no PIAA member school within District XI utilizing the services of Coach Porrata during this period shall be permitted to participate in post-season competition.

6.      Should Omar Porrata desire to coach a PIAA District XI member school after the 2014-15 season, he is required to first take and provide confirmation of successful completion of three professional development courses.   The three required courses are:

        a. <u>NFHS Fundamentals of Coaching, 2.0,</u> online, presented on the NFHS website, www.nfhslearn.com
        b. <u>NFHS Sportsmanship, 2.0</u> presented on the NFHS website, www.nfhslearn.com
        c. <u>ASEP Coaching Principles</u> (in classroom format, not online format).

Coach Porrata must submit the completed course certifications and submit them to his athletic director or principal prior to coaching any PIAA contests.

If dissatisfied with this decision, Palisades High School and Coach Porrata (through Palisades High School) may appeal this decision by contacting the PIAA Executive Director Robert Lombardi within thirty days of this decision.

Pl.'s Ex. 13.[5]

212.   Regarding the Committee's findings, the Committee did not explicitly base any finding on evidence that was arguably improperly referenced by any of the Committee members (or Hartman) during the hearing.  Pl.'s Ex. 13.[6]

213.   The Committee's findings do not reference any reason for the forfeiture; instead, they merely indicate that Palisades H.S. had forfeited the match and lost 84-0.  Pl.'s Ex. 13.

214.   Article XII, Section 5 of the PIAA By-Laws states that if a party fails "to fulfill any of the material terms of a Contract for Contest . . . the breaching school will be subject to any of the penalties described in ARTICLE XIII, PENALTIES, Sections 2 through 7, of the PIAA By-Laws."  Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 27, PIAA By-Laws art. XII, § 5.

---

[5] The actual penalties were identical to those orally announced at the conclusion of the Committee hearing on February 16, 2014.  Pl.'s Ex. 1, Comm. Hrg. Tr. at 69-70.
[6] The findings reference the scores of the matches with Jim Thorpe and Catasauqua and those scores were not referenced during the hearing.  Pl.'s Ex. 13.

215.   Sections 2 through 7 of Article XIII of the PIAA By-Laws provide that possible sanctions to a school include, *inter alia*, (1) suspension from membership in the PIAA or the school's teams being suspended from PIAA competitions, and (2) probation.  Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 27-28, PIAA By-Laws art. XIII, §§ 2-7.

216.   Article XIII of the PIAA By-Laws provides for the imposition of penalties, including, but not limited to, the following:

**Section 6.      Public Censure.**

In addition to, or in lieu of, such other discretionary penalties as provided by the By-Laws, a school and/or the individual(s) responsible for the violation(s) may be publicly censured.

Public censure is intended to manifest strong disapproval of the actions which led to the imposition of this penalty, and is effected through its inclusion in the decision letter.

**Section 9.      Violations by Individuals.**

**A.      Rectifying Action by School.**

If it is determined that a school's administration, faculty, Coaches, Teams, students, or Team followers engaged in flagrant misconduct and/or conduct which violates one or more provisions of the Constitution, By-Laws, Policies and Procedures, and/or Rules and Regulations of PIAA, and/or misconduct which is contrary to the purposes of PIAA, that school may be directed by its District Committee, Regional Panel, or, if the conduct occurred in an Inter-District Contest, by the Executive Director or Board of Directors, within their respective jurisdictions, to impose appropriate discipline upon such persons or to take other rectifying action for such conduct.

PIAA may require the school to take specified rectifying action and/or to impose specified appropriate discipline upon such persons as a condition for not imposing penalties upon the school for flagrant misconduct and/or violations of the Constitution, By-Laws, Policies and Procedures, and/or Rules and Regulations by the individuals enumerated in this Section.

Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 2, PIAA By-Laws art. 13, §§ 6, 9.

217.   Porrata did not receive a copy of the February 18, 2014 written decision directly from the PIAA; however, he did receive it from someone at Palisades H.S.  Inj. Tr. at 90.

218.  The fact that the PIAA did not directly send the written decision to Porrata did not affect his ability to appeal from the decision or to decide what issues he wanted to appeal.  Inj. Tr. at 90-92.

### F.  Porrata's Appeal from the Sanctions

219.  Upon receiving notice of the sanctions the Committee imposed against him, Porrata sought to appeal from the sanctions.  Inj. Tr. at 40.

220.  Regarding appeals, the PIAA Policies and Procedures provide, *inter alia*, as follows:

**IV.    Persons with Standing to Appeal.[7]**

. . .

      **C.**    Students and other individuals affiliated with a school desiring that an appeal be filed shall contact their school Principal and request that the school appeal the decision on their behalf.

. . .

**V.    Request for Appeal Hearing.**

      **A.**    All appeal hearings shall be made in writing by the Principal of the appealing school, or the sports official, to the Executive Director. The letter shall provide sufficient information to enable the Executive Director to identify the issue(s) involved. . . .

      **B.**    Upon scheduling the appeal hearing, the Executive Director shall request the Regional Panel Chairman, District Chairman, or District Executive of the District Committee from which the appeal arose to forward to the Executive Director for use by the Board of Directors or Board of Appeal all materials presented to and prepared by it in connection with its decision, and any transcript which has been made of the proceedings before the Regional Panel or District Committee.

      **C.**    Upon request of . . . an adult who is subject to sanction at the hearing, and/or counsel . . ., the Executive Director shall provide

---

[7] Part XI of the procedural standards for regional panels and district committees contains a similar provision.  Pl.'s Ex. 3, PIAA Policies and Procedures at 24.

the requesting person with a copy of all written material received
for the appeal hearing.

Pl.'s Ex. 3, PIAA Policies and Procedures at 25-26.

221.   On March 5, 2014, Porrata had a meeting with George, Scheibenhofer, and
Heffernan, during which they showed him a copy of the letter they were sending to the PIAA on
his behalf.  Inj. Tr. at 41-42, 252, 291.

222.   Porrata also provided a letter he drafted, dated March 4, 2014, to George, in which
he indicated that he sought to appeal the three sanctions he believed applied to him.  *See* Inj. Tr.
at 42, 43-44, 92, 253, 291, 311; Pl.'s Ex. 14.

223.   In the letter, Porrata stated that he did not engage in unsportsmanlike conduct
because coaches forfeit throughout the season and he was not doing anything different than
another coach would do.  Pl.'s Ex. 14.  In addition, he indicated that he decided to forfeit because
of the health of the team after consulting with the team, the other coaches, and the parents.  *Id.*
Moreover, he claims that he did not violate a district schedule because the tournament was a
double elimination tournament and they followed all rules that pertain to the tournament.  *Id.*

224.   Although George believes that reading the letter would have been important,
George did not read the letter that Porrata provided to her.  Inj. Tr. at 311-12.

225.   Despite George not reading the letter, when the administrators asked Porrata about
the sanctions he was appealing from, Porrata informed them of only the issues that they included
in the subsequent letter to the PIAA.  Inj. Tr. at 312.

226.   Porrata and the Palisades' administrators discussed the issues that Porrata wanted to
appeal.  Inj. Tr. at 253, 292.

227.   Porrata agreed to the issues being appealed.  Inj. Tr. at 253.

228.    Based on the conversation on March 5, 2014, George drafted a letter for Heffernan's signature.  Inj. Tr. at 292.  This letter accurately reflected what Porrata orally stated he wanted to appeal.  *Id.* at 253, 292.

229.    On the day after the meeting, Heffernan sent a letter to Dr. Lombardi, dated March 6, 2014, in which he stated that

> [o]n behalf of our Head Wrestling Coach, Omar Porrata, the Palisades School District is requesting an appeal of . . . District XI's decision made on February 16, 2014.  Palisades is willing to make this request for an appeal for Coach Porrata as per policy and also to allow for his voice to be heard at the PIAA level.  We as the Palisades School District are not interested in appealing . . . District XI's sanction against us.

Inj. Tr. at 45, 328; Pl.'s Ex. 15.  Heffernan also indicated that Porrata was appealing from the Committee's fifth and sixth sanctions as they pertain to him.  Inj. Tr. at 46; Pl.'s Ex. 15.

230.    Heffernan's March 6, 2014 letter states that Porrata was copied on it.  Pl.'s Ex. 15; Inj. Tr. at 97.  George could not recall how she provided a copy of the letter to Porrata.  Inj. Tr. at 292.  Typically, she would have directly handed it to him or placed in an envelope and put it in the wrestling inbox.  *Id.*

231.    Palisades H.S. did not refuse to appeal all the sanctions imposed against Porrata; instead, despite Porrata's request in his letter dated March 4, 2014, Heffernan's letter represented the substance of the conversation on March 5, 2014.  Inj. Tr. at 253, 292.

232.    After Heffernan sent the letter to Dr. Lombardi, George never heard anything from Porrata or his counsel indicating that Porrata wished to appeal any other issues.  Inj. Tr. at 292.

233.    The fact that Heffernan, as principal, submitted the appeal to the PIAA was the "standard operating procedure" at the PIAA.  Inj. Tr. at 330.

234.   Under Article X of the PIAA Constitution, the principal is responsible for a school's athletic program.  Inj. Tr. at 330-31; Pl.'s Ex. 2, 2013-2014 PIAA Const. and By-Laws at 7, PIAA Const. art. X.

235.   During Dr. Lombardi's two-year term as executive director, the PIAA has always worked through the principal of the school rather than the person whose interests were at issue. Inj. Tr. at 331.

236.   In response to Heffernan's March 6, 2014 letter, Dr. Lombardi sent a letter, dated March 11, 2014, to Heffernan in which he indicated that the appeal hearing would occur on March 20, 2014, and verified that Porrata was interested in appealing the Committee's fifth and sixth sanctions, which were against him.  Inj. Tr. at 47-48, 49, 328-39, 332-33; Pl.'s Ex. 17.

237.   In the March 11, 2014 letter, Dr. Lombardi also provided Heffernan with the following information about the hearing:

> The appeal hearing will proceed pursuant to the "Procedural Standards for Appeal Hearings", as set forth on pages 25 to 33 of the Policies and Procedures Section of the 2013-2014 <u>PIAA Handbook</u>, which is available on the PIAA Web site at <u>www.piaa.org</u>.  Please become familiar with these standards.  Please note that Standard VIII, Conduct of Appeal Hearing, J, Length of Hearing (page 32), which limits presentations to no more than forty-five (45) minutes per school, or per person who's [sic] interest is at issue in the proceeding, including questions to adverse witnesses.  Should you anticipate that additional time will be needed, please notify the undersigned at 1-800-382-1392, in advance, so that subsequent hearings that day may be appropriately scheduled.

> Please note that, pursuant to the Procedural Standards for Appeal Hearings, since the hearing before the District XI Committee was transcribed, the appeal will be limited to oral argument based upon the written and oral evidence presented before the District Committee.  It is my understanding that the appeal is limited to the form of the sanction imposed by the District Committee.  The Board of Appeal may affirm, lift, or modify the sanctions imposed by the District Committee.  In modifying the sanctions, the Board of Appeal may impose sanctions lesser than, different from, or greater than, those imposed by the District Committee.

Pl.'s Ex. 17.

238.   Although Dr. Lombardi did not send a copy of this letter to Porrata, Porrata received a copy after George e-mailed it to him.  Inj. Tr. at 48, 97, 293.

239.   Thus, even if Porrata did not receive a copy of Heffernan's March 6, 2014 letter until just before the Board of Appeal hearing, he knew that only two issues had been appealed well prior to the hearing.  Inj. Tr. at 98.

240.   Porrata did not go to Palisades H.S. or the PIAA to ask to change or expand the issues at the appeal hearing.  Inj. Tr. at 98, 99-100.

241.   Dr. Lombardi's letter does not indicate any provisions of the PIAA Constitution or By-Laws that Porrata allegedly violated.  Inj. Tr. at 129.

242.   Prior to the Board of Appeal hearing, George discussed with Porrata that the Board could expand the sanctions imposed against him by extending the time from one to two years. Inj. Tr. at 102-03.

243.   Porrata indicated that he wanted to proceed with the appeal even though the Board of Appeal could expand the penalties.  Inj. Tr. at 103.

244.   By virtue of the PIAA's Policies and Procedures, Porrata could not have filed an appeal by himself and had to use Palisades H.S. to file the appeal on his behalf.  Inj. Tr. at 355-56.

245.   The PIAA has not had an incident where a school refused to file an appeal on behalf of an aggrieved student-athlete or coach.  Inj. Tr. at 356.

246.   The PIAA would not have authority to sanction a school that refused to file an appeal.  Inj. Tr. at 356.

### G.  The Appeal Hearing on March 20, 2014

247.   The PIAA held an appeal hearing on March 20, 2014.  Inj. Tr. at 49.

45

248.   Concerning the applicable record on appeal, the PIAA's Policies and Procedures provide that, *inter alia*, "[w]here a transcript has been made of the proceedings before the Regional Panel or District Committee, the record on appeal shall be limited to that transcript and any written materials that were before the Regional Panel or District Committee in connection with the making of its decision."  Pl.'s Ex. 3, PIAA Policies and Procedures at 26 § VI.C.

249.   Regarding notification of the appeal hearing, the PIAA's Policies and Procedures provide in pertinent part as follows:

**VII.    Notification of Appeal Hearing.**

    **A.    Scheduling Letter.**

In all cases where a hearing is to be held, the Executive Director, or the Executive Director's designee, shall send a letter ("Scheduling Letter") to . . . the Principal of the school(s) involved; . . .; and . . . any student or adult who may be subject to the sanction as a result of findings by the Board of Directors or the Board of Appeal, advising them of the following:

1.  The date, time, and place of the hearing.

2.  How the case arose . . . .

3.  The issue(s) involved, citing the applicable provision(s) of the PIAA Constitution, By-Laws, Policies and Procedures, and/or Rules and Regulations. . . .

4.  (a)  Where there is a transcript of the proceedings before the Regional Panel or District Committee, and the record on appeal is therefore limited to the testimony and papers before the Regional Panel or District Committee, the fact that the appealing party and any individuals involved, including students, are entitled to bring with them to the appeal hearing any persons whom they desire to attend, and to be represented by counsel.   The hearing shall be limited, however, to argument based upon the record previously submitted.

. . .

> 5.   That the Board of Directors or Board of Appeal will have copies of the written materials submitted to and by the Regional Panel or District Committee, as well as any correspondence subsequent thereto, making it unnecessary for the parties to provide them.  Should the school or student not have copies of any of these materials, a request may be made to the Executive Director to provide a set to the parties.

> 6.   That, if the Principal has any questions, that Principal is to contact the Executive Director or another specified person.

Pl.'s Ex. 3, Policies and Procedures at 26-27, § VII.

250.   Concerning requests for continuances and postponements of appeal hearings, the PIAA Policies and Procedures state as follows:

**G.      Continuances and Postponements.**

> A request by any party for a continuance or postponement of a hearing shall be sent in writing to the Executive Director, who shall have the discretion to grant or deny the request.  Requests should set forth the reasons for requesting the continuance or postponement of the hearing, and should be submitted at least one week prior to the scheduled date of the hearing.  Where there will be no prejudice to any party, the request should be given serious consideration by the Executive Director.

> Requests made within one week of the scheduled hearing will be granted only upon the showing of unforeseen circumstances and compelling grounds, and if the hearing can be rescheduled without prejudice to the other parties.

> Requests made on the day of the hearing should be ruled upon by the presiding officer at the hearing.  The presiding officer may submit the request for consideration by the body hearing the appeal.  Requests made on the day of the scheduled hearing will be granted only upon the showing of unforeseen circumstances and compelling grounds, and if the hearing can be rescheduled without prejudice to the other parties.  As a condition of granting the request, the party requesting the continuance or postponement may be required to reimburse other parties for expenses incurred in attending the hearing.

Pl.'s Ex. 3, Policies and Procedures at 28, § VII.G.

251.   The PIAA needed five members of the board of directors to sit and hear the appeal, and one among three officers, the president, the vice president, or the treasurer.  Inj. Tr. at 330.

252.   Eight members heard Porrata's appeal.  Def.'s Ex. 2.

253.   No member of the Committee was permitted to sit on the Board of Appeals.  Inj. Tr. at 330.

254.   Approximately three days prior to the appeals hearing, despite her "lack of expertise in that area," Linay Haubert, Esquire ("Haubert") offered to represent Porrata at the Board of Appeal hearing.  Inj. Tr. at 178, 179, 189.

255.   Haubert knew Porrata because she has two sons in the Palisades youth wrestling program and one in the middle school program.  Inj. Tr. at 177.

256.   Haubert served as Porrata's counsel at the Board of Appeal hearing.  Inj. Tr. at 106, 178.[8]

257.   At the beginning of the hearing, one of the PIAA Board members read an introductory statement.  Inj. Tr. at 100, 101; Def.'s Ex. 2.

258.   This introductory statement indicated that Porrata was appealing from the imposition of two of the sanctions.  Inj. Tr. at 101; Def.'s Ex. 2.

259.   Neither Porrata nor Haubert objected to the scope of the issues presented.  Inj. Tr. at 101.

260.   The introductory statement also informed Porrata that the Board of Appeal could remove, modify, or extend the sanctions, and the member asked him if he still wanted to proceed.  Inj. Tr. at 104; Def.'s Ex. 2.

---

[8] In her law practice, Haubert generally handles workers compensation defense and social security disability appeals. Inj. Tr. at 176-77.

261.  Despite this warning, Porrata indicated that he wanted to proceed with the hearing. Inj. Tr. at 104, 105, 187.

262.  Dr. Lombardi noted that a participant at a district committee or Board of Appeal hearing is often represented by counsel.  Inj. Tr. at 331, 332.  An attorney is not prohibited from presenting any particular evidence or presenting any arguments that he or she wants to present. *Id.* at 332.

263.  During the hearing, Haubert did not attempt to introduce any evidence on Porrata's behalf; however, she did try to argue that the penalties were inappropriate and too severe, and she tried to reference how similar situations had been handled throughout Pennsylvania.  Inj. Tr. at 179.

264.  Haubert believed that she could not introduce new evidence because it was an appeal.  Inj. Tr. at 179.

265.  Individuals from Palisades H.S. also present during the Board of Appeal hearing included George, Heffernan and Scheibenhofer.  Inj. Tr. at 180.

266.  Haubert recalled a board member asking about any evidence Heffernan might have obtained with respect to the absences of the wrestlers before and after the Bethlehem Catholic match. Inj. Tr. at 180.

267.  Haubert objected to Heffernan's evidence about the student-athlete's absences, arguing that it was inappropriate for the hearing.  Inj. Tr. at 180.

268.  Haubert received a packet of materials from the Board of Appeal, and those materials did not include the three parent notes that had been introduced before the Committee at the February 16, 2014 hearing.  Inj. Tr. at 181.

269.  This packet included, *inter alia*, (1) a copy of the introductory statement, (2) a copy of the Palisades School District Statement before the Committee, (3) the rosters and results of the Palisades H.S.'s wrestling team's match against Jim Thorpe on January 30, 2014, (4) the results of the Palisades H.S.'s wrestling match against Catasauqua on February 1, 2014, (5) the results of the Palisades H.S.'s wrestling match against Bethlehem Catholic, (6) a report on Porrata's disqualification from a wrestling meet in February 2012, (7) a copy of a February 14, 2014 article in The Morning Call in which Porrata explained why he forfeited the match against Bethlehem Catholic, (8) a copy of a December 2013 article in The Morning Call in which Porrata commented about the Catasauqua wrestling team, and (9) an e-mail from Sandy McNichol, a parent of a Palisades Middle School student, criticizing Bethlehem Catholic and supporting Porrata.  Def.'s Ex. 2.[9]

270.  Haubert believes she provided competent representation of Porrata at the appeals hearing.  Inj. Tr. at 182-83.

271.  Prior to the Board of Appeal hearing, Haubert had reviewed the transcript of the Committee hearing and the PIAA's procedures for hearings.  Inj. Tr. at 183.

272.  Although she would have liked more time, Haubert believes she had sufficient time to prepare for the hearing.  Inj. Tr. at 183-84.

273.  Haubert also knew the PIAA procedural standards had a specific provision relating to continuances.  Inj. Tr. at 184.

274.  Porrata provided Haubert with a document informing her that the only issues before the Board were the year-long suspension and the continuing education sanctions.  Inj. Tr. at 185.

---

[9] Unfortunately, while it appears that the documents in the Board of Appeal packet would have (or could have) explained some of the references to evidence not expressly introduced in the record at the Committee hearing, the parties did not present any evidence directly linking these documents to the Committee hearing.

275.  Haubert did not investigate whether Porrata could expand the scope of the appeal. Inj. Tr. at 186.

276.  According to Haubert's research of the PIAA's Policies and Procedures, she did not believe she had the authority to request any change in the scope of the appeal once it was filed. Inj. Tr. at 188.

277.  Prior to the Board of Appeal hearing, Heffernan had obtained several attendance-related documents.  Inj. Tr. at 271.  The documents contained information as to which Palisades H.S. wrestlers were absent from school on January 29, 2014, January 30, 2014, or January 31, 2014.  *Id.*  He also had logs from the nurse's office for January 30, 2014 and January 31, 2014, which indicated that no wrestler had gone to the nurse's office on those days.  *Id.* at 271-72.  Although he had reviewed these documents, he did not offer them to the Committee and did not have them with him for the hearing.  *Id.* at 272.

278.  Dr. Lombardi indicated that the focus of the Board of Appeal was on the forfeiture itself insofar as the forfeiture was not merely the coach telling the official and opposing coach that the team was not going to participate; instead, Porrata had "march[ed] kids to the table . . . for each of the 14 weight classes, to put those students out there and basically embarrass them." Inj. Tr. at 335.  In addition, Porrata's lack of communication with the referee and the opposing team was concerning because he failed to represent his school properly in an invitational tournament.  *Id.* at 335-36.

279.  At the conclusion of the hearing, the Board of Appeal voted in open session and unanimously voted to uphold the Committee's sanctions and modify one sanction.  Inj. Tr. at 49, 105, 336.

280.   The Board of Appeal modified one sanction by extending the 2014-2015 post-season ban on District XI schools to include any PIAA member school.  Inj. Tr. at 49, 105, 336.

281.  Dr. Lombardi attended the hearing, but he did not vote in the case.  Inj. Tr. at 333.

282.   As part of Dr. Lombardi's function as secretary for the Board of Directors, he provides the Board of Appeal's decision letter to a school.  Inj. Tr. at 334.

283.  Dr. Lombardi sent a letter, dated March 27, 2014, to Heffernan.  The letter states, in pertinent part, as follows:

> Following the appeal hearing conducted on Thursday, March 20, 2014, concerning the conduct of the head wrestling coach of Palisades High School ("Palisades") in its appeal of the February 16, 2014 decision of the PIAA District XI Committee ("District XI Committee"), a PIAA Board of Appeal considered the written materials submitted to and by Palisades, and by the District XI Committee, including a transcript of the District XI Committee hearing (the "Transcript"), as well as the oral arguments presented to the Board of Appeal.
>
> The following persons appeared and offered testimony for Palisades:  Palisades Principal, Richard J. Heffernan and Palisades Assistant Principal, Karl R. Scheibenhofer, Rebecca S. George, Palisades Director of Athletics, and Omar Porrata, Palisades head wrestling coach.  Mr. Porrata was represented by counsel, Lin Haubert, Esq.  Also in attendance, but not participating in the proceeding were the following parents identified as parents involved in the Palisades wrestling program:  David Haubert, Larry Wasser and Jeff Robinson.
>
> Robert F. Hartman, Jr., Chairman, W. Bradley Pensyl, Vice-Chairman, David Troxell and Thomas Moll of the District XI Committee were present and available to respond to questions from the Board of Appeal.
>
> . . .
>
> This appeal was limited to the appropriateness of the . . . sanctions listed in items #5 and #6 in the District XI decision letter[.]
>
> . . .
>
> The PIAA Board of Appeal made the following findings and determinations:
>
> 1.      This matter arises out of an incident that occurred at the PIAA District XI AA Team Wrestling Championships on Thursday, January 30, 2014.

2.      After successfully competing in a Round 1 Contest at 6:00 p.m. on January 30, 2014, utilizing 9 available wrestlers plus an additional wrestler who physically could not compete but who nonetheless weighed-in to obtain a decision by forfeit, Palisades, at the direction of Mr. Porrata, forfeited matches in all 14 weight classes in its 7:30 p.m. Round 2 Contest against Bethlehem Catholic.

3.      Coach Porrata did not inform any school personnel, District XI official, medical personnel or meet administrator, in advance, of his decision to forfeit all matches.

4.      Palisades suspended Coach Porrata immediately and indefinitely upon learning of his actions of January 30; on January 31, District XI reinforced this measure by informing Palisades that its wrestling team could not compete on February 1 unless Coach Porrata remained under suspension.

5.      On February 1, the Palisades wrestling team, absent Coach Porrata, sent 10 wrestlers into a scheduled consolation match.

6.      On February 6, the official pronouncement from Mr. Porrata to his Principal was that he withheld his wrestlers from the Bethlehem Catholic Contest due to illness and injury of his wrestlers.

7.      In response, Palisades continued its suspension of Coach Porrata, and further instructed that he would be suspended from coaching for the remainder of the 2014 wrestling season.

To summarize, there is no dispute that the Palisades wrestling team did not compete in a scheduled contest, willfully and without good cause, which is contrary to the requirements of ARTICLE XII, Section 5.   Cancellation of Contract or Failure to Honor District Schedule, of the PIAA By-Laws.  Coach Porrata's attempted justification on the grounds that his wrestlers were ill and/or injured is hollow and lacks credibility, particularly where those same wrestlers competed, victoriously, an hour and a half earlier, and again competed within 48 hours thereafter.  Coach Porrata's failure to inform any persons of authority of his unilateral decision to not compete is equally abhorrent.

For its part, Palisades has taken the position that it does not support Mr. Porrata's appeal, and did not offer any defense of his actions at this appeal.

On the basis of the foregoing, the PIAA Board of Appeal, by unanimous vote (8-0), determined to sustain, with modification, the decision of the District XI Committee as to the two appealed sanctions.  The modification is to extend the terms of suspension, as set forth in Item 5 of the District XI decision, to the entirety of PIAA members schools and with regard to all PIAA sanctioned sports.

Pl.'s Ex. 18.

284.  The Board of Appeal extended the sanctions to all PIAA member schools because it did not want Porrata to be able to circumvent the intent of the penalty by merely going to a neighboring district to coach.  Inj. Tr. at 336-37.

285.  Despite the severity of the sanction, a school can hire Porrata because the team can still participate in the regular season.  Inj. Tr. at 337.  Thus, a PIAA school is not strictly prohibited from hiring Porrata.  *Id.*

286.  There are schools that may not advance to the post-season that could hire him, and he could work in New Jersey and in various youth programs, middle school programs, club programs, or the Junior Olympics.  Inj. Tr. at 337-38.

287.  He could also coach for a non-PIAA member school.  Inj. Tr. at 338.

288.  Although no one from the PIAA sent a copy of the letter to Porrata, he received the letter after George sent it to him.  Inj. Tr. at 49, 50-51, 105, 293.

289.  Porrata believes that George sent him a copy of Dr. Lombardi's March 27, 2014 letter approximately one-and-a-half weeks after it was issued.  Inj. Tr. at 106, 107.

290.  Dr. Lombardi's March 27, 2014 letter also indicates that the PIAA sent a copy of it to Haubert.  Inj. Tr. at 106; Pl.'s Ex. 18.

291.  George authored a letter dated March 27, 2014, to Porrata in which she stated as follows:

> Thank you for your six years of service as Palisades School District head wrestling coach.  Due to your unsportsmanlike actions which are in direct violation of the purposes of PIAA, and based on the sanctions levied by the PIAA committee on March 20, 2014 that effective immediately and ending at the conclusion of the 2015 PIAA wrestling championships, precluding any PIAA member school utilizing your services in any PIAA sanctioned sport to participate in post-season competition, I will not be recommending your contract with the Palisades School District to be renewed for the 2014-15 school year.

Inj. Tr. at 298-99; Pl.'s Ex. 22.

292.  George's March 27, 2014 letter does not reference Porrata lying to them as a reason for not renewing his contract.  Inj. Tr. at 299.

293.  On March 31, 2014, Dr. O'Connell sent a letter addressed to the parents of Palisades wrestlers.  Inj. Tr. at 165-66; Pl.'s Ex. 21.

294.  Dr. O'Connell's letter stated in pertinent part as follows:

Dear Parents of Palisades Wrestlers:

. . .

As you may have already learned, the sanctions issued by the PIAA Executive [sic] against Coach Porrata are as follows:

> Effective immediately and ending at the conclusion of the 2015 PIAA Wrestling Championships, no PIAA member school utilizing the service of Coach Porrata during this period shall be permitted to participate in post-season competition.

As a result of this sanction, I cannot recommend a renewal of Omar Porrata's contract with the Palisades School District.

At the end of this week, the following press release will be shared with our media outlets:

> The Palisades School District has opened a search for a new head wrestling coach.

> The District would like to thank Mr. Omar Porrata for his six years of service as head wrestling coach of the Palisades Wrestling Program. During Mr. Porrata's time at Palisades he took a struggling program that was near extinction and turned it around.  In recent years the Palisades wrestlers have qualified for the Colonial League Championships, District XI team duals and individual wrestlers have placed at the state competition.

> The future of Palisades Wrestling looks bright and we look forward to seeing the success of the Palisades Wrestling program continue.

Pl.'s Ex. 21.

295.  In drafting the March 31, 2014 letter, Dr. O'Connell worked on most of the letter herself, but she did discuss some of its substance with Heffernan.  Inj. Tr. at 265.

296.  Heffernan indicated that they drafted the letter in a "politically correct" fashion that would not "bury" Porrata for future job opportunities.  Inj. Tr. at 265.  Also, it was "as nice as it could possibly be . . . for him and for our student athletes moving forward."  *Id.*  They did not include information about Porrata's dishonesty because he had done a lot for the program, and they also did not want to mention some of the "dirty laundry" with the community.  *Id.* at 266.

### H.  Porrata's Future Employment Opportunities at Palisades or Elsewhere

297.  Palisades H.S. has informed Porrata that it does not intend to renew his employment contract.  Inj. Tr. at 56.

298.  Palisades H.S. has started soliciting for a new wrestling coach and it has posted an opening for the position.  Inj. Tr. at 56, 251.

299.  Palisades H.S. has started scheduling interviews for the coaching position and those interviews start on May 5, 2014.  Inj. Tr. at 56.

300.  Porrata has applied for the head wrestling coach position at Palisades H.S., and he would like to continue to coach there.  Inj. Tr. at 56, 57, 137, 251, 288.

301.  If Porrata cannot coach at Palisades H.S. next year, he would like to coach at another PIAA school.  Inj. Tr. at 57.

302.  Porrata has submitted applications for employment as a wrestling coach at one school other than Palisades H.S., and that school seemingly is Liberty High School.  Inj. Tr. at 57, 87.

303.  Porrata is also in the process of applying to a couple of other schools.  Inj. Tr. at 87.

304.  It has been very difficult for Porrata over the past few months as he is passionate about coaching, and he has developed strong relationships with the wrestlers and the parents in the Palisades wrestling program.  Inj. Tr. at 57-59.

305.  As attested by multiple witnesses, such as Gretzinger, Wasser, and Jeff Robinson, Porrata has achieved impressive results with the wrestling program, and he has invested significant time and energy in the Palisades Middle School and youth league wrestling programs, which go beyond his duties as the Palisades H.S. head varsity wrestling coach.  Inj. Tr. at 160-63, 194, 209-12.

306.  Palisades H.S. has created a stakeholder's committee that will conduct interviews of prospective candidates for the head coach of the varsity wrestling team.  Inj. Tr. at 136.

307.  The stakeholder's committee consists of approximately ten members and includes student-athletes (including members of the wrestling team), a couple of parents of wrestlers on either the varsity team or in the youth program, George, Heffernan, and possibly someone from the booster's club.  Inj. Tr. at 136-37, 250-51, 269, 270, 287, 300-01.

308.  George's role with the committee is to advertise for open positions, accept applications, review applications, and decide who the committee will interview by collaborating with Heffernan and occasionally, Scheibenhofer.  Inj. Tr. at 287-88, 302, 315.

309.  George also will schedule meetings of the stakeholders, arrange for the interviews, participate in the interviews, and notify the successful recommendation from the committee to Dr. O'Connell.  Inj. Tr. at 287-88.

310.  Heffernan assists the stakeholder's committee with screening applications and identifying candidates.  Inj. Tr. at 250-51, 269.

311.  Eddie Ruisz ("Ruisz") is a member of the Palisades School District School Board after his election in November 2013.  Inj. Tr. at 134.

312.  Ruisz has discussed the Bethlehem Catholic match with Porrata and a number of parents.  Inj. Tr. at 134, 135.

313.  Based on his observations of Porrata, Ruisz believes that Porrata is a very dedicated coach who connects with the kids and the community.  Inj. Tr. at 135.

314.  Ruisz is part of the stakeholders committee, and this is his first time serving on a committee to hire a coach.  Inj. Tr. at 136.

315.  The stakeholders committee will try to reach a consensus as to which coaching candidate it will recommend to Dr. O'Connell.  Inj. Tr. at 137-38.

316.  Upon reaching a consensus, the stakeholders committee will recommend a candidate to Dr. O'Connell.  Inj. Tr. at 269.

317.  Ruisz is unsure as to what would happen if the stakeholders committee was unable to reach a consensus, and he is not sure of which individual has final decision-making authority.  Inj. Tr. at 137-38.

318.  If Dr. O'Connell did not object to the stakeholders committee's recommendation, she would present the recommendation to the School Board.  Inj. Tr. at 138, 269.

319.  The final decision for approving a contract, such as the contract for the head coach of the varsity wrestling team, lies with the Palisades School Board.  Inj. Tr. at 138, 270-71.

320.  The School Board consists of nine members, and a majority of the School Board would have to approve the contract.  Inj. Tr. at 139, 141.

321.  If the PIAA sanctions were not in place against Porrata, Ruisz would vote to retain him as the wrestling coach for another year.  Inj. Tr. at 140-41, 143, 147-48.

322.  If the sanctions remain in place, Ruisz would be reluctant to recommend Porrata because it would negatively affect Palisades H.S. student-athletes insofar as they could not participate in post-season competitions.  Inj. Tr. at 143.

323.  Ruisz is aware that the school administrators will not recommend Porrata's rehiring because of his unsportsmanlike conduct and because they believe he lied to them.  Inj. Tr. at 142, 144, 145.

324.  The three Palisades administrators met, and Porrata will not receive an interview for the position of head varsity coach at Palisades H.S.  Inj. Tr. at 288, 315-16.

325.  The decision as to who will be interviewed had never been reversed by anyone at Palisades while George has worked there.  Inj. Tr. at 316.

326.  Heffernan and George do not believe that Porrata is a viable candidate to be the head coach because of his dishonest behavior and, even if the PIAA sanctions were not in place, Porrata would not be a viable candidate.  Inj. Tr. at 251, 291.

327.  Heffernan does not believe that Porrata is a viable candidate because of (1) his dishonesty toward them, (2) their issues with his character and integrity, and (3) the fact that he had been suspended for two of the last three seasons, causing him to be ineligible to coach the team in the post-season.  Inj. Tr. at 251-52.

328.  George does not believe that Porrata is a viable candidate for the position because (1) he was dishonest with them, (2) the incident with Bethlehem Catholic was unsportsmanlike, (3) this is the second time in three years that he could not perform his coaching duties through the end of the season, (4) she can no longer trust him, and (5) he displayed behaviors demonstrating a total lack of disregard for authority.  Inj. Tr. at 288, 290-91, 301, 303, 315.

329.  Regarding Heffernan and George's reference to Porrata's other suspension in the past three years, Heffernan indicated that Porrata was cited with unsportsmanlike conduct and was ejected from the Colonial League Championships.  Inj. Tr. at 252.

330.   Based on this misconduct, Porrata had to write apology letters to District XI officials, the parents of the wrestling community, and the referee that he had an issue with that resulted in his ejection.  Inj. Tr. at 252.

331.   Heffernan and George told Porrata at that time that if he had any further unsportsmanlike conduct or behavior, Palisades would immediately terminate his employment. Inj. Tr. at 252.

332.   During Heffernan and George's tenure as principal and athletic director, respectively, at Palisades H.S., the School Board has never overruled the stakeholders committee concerning a candidate.  Inj. Tr. at 274.

333.   If George, as athletic director, and Heffernan, as principal, recommend a candidate, the stakeholders committee has never overruled that recommendation.  Inj. Tr. at 274.

334.   There is no risk of any imminent harm to Porrata due to the sanctions imposed by the PIAA.

335.   If Porrata is unable to coach during the 2014-2015 season for a PIAA member school that chooses not to hire him because of the PIAA sanctions, Porrata has an adequate remedy at law for any wrongdoing by the PIAA and any damages he may suffer.

336.   The grant of the requested injunctive relief would disrupt and interfere with the PIAA's ability to discipline its coaches and schools for unsportsmanlike conduct.  Inj. Tr. at 338.

337.   Outside of his relationship with Palisades administrators, Porrata did not show that his reputation has been or will be damaged by the PIAA's sanctions.

## V.    DISCUSSION

### A.    Standard for Preliminary Injunctive Relief

"Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994) (quotation omitted)).   Thus, a district court should not grant a motion for preliminary injunctive relief unless the moving party shows "(1) a likelihood of success on the merits; (2) that [the moving party] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."   *Id.* (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)).

### B.    Analysis

After considering the applicable factual record in this matter, the court finds that Porrata is not entitled to preliminary injunctive relief because he failed to demonstrate that he will suffer immediate irreparable harm if the court denies the motion.   A party's failure to demonstrate a reasonable likelihood of success in the litigation <u>or</u> an irreparable injury "must necessarily result in the denial of a preliminary injunction."   *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982).   Since the plaintiff failed to demonstrate immediate irreparable injury, the court finds it unnecessary to address the other requirements for an injunction, including Porrata's likelihood of success on the merits of his due process and equal protection claims.

Concerning a showing of irreparable harm, "the plaintiff must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial.   The preliminary

injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C. F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  In addition,

> [e]conomic loss does not constitute irreparable harm:
>
> > [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury:
> >
> > > "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief might be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."
>
> *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 952-53, 39 L.Ed.2d 166 (1974) (footnotes omitted) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Thus, in order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction must "'be of a peculiar nature, so that compensation in money cannot atone for it....'" *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976) (quoting *Gause v. Perkins*, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857)).  The word irreparable connotes "'that which cannot be repaired, retrieved, put down again, atoned for....'" *Id.* (quoting *Gause*, 3 Jones Eq. 177, 69 Am.Dec. 728).

*Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (emphasis in original).  The "risk of irreparable harm [also] must not be speculative."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) (citation omitted).

Here, Porrata initially claimed that he would suffer irreparable harm if the court did not issue a preliminary injunction because he wants to continue to coach at Palisades and "there is virtually no chance that Palisades will rehire" him if the PIAA's sanctions remain in place.  *See* Pl.'s Br. in Sup. of Mot. for Prelim. Inj. Relief ("Pl.'s Br.") at 34, Doc. No. 6.  Although this was Porrata's claim leading up to the evidentiary hearing, the evidence presented at the hearing

overwhelmingly illustrated that he could not demonstrate irreparable harm because he could not demonstrate that Palisades H.S. would rehire him in any event.

In this regard, the evidence shows that Palisades H.S. created a stakeholders committee to consider applicants for the position of head coach of the varsity wrestling team. Although the stakeholders committee will interview prospective candidates for the wrestling coach and provide a recommendation to Dr. O'Connell, George (in collaboration with Heffernan and occasionally Scheibenhofer) decides who the committee will actually interview. These three Palisades administrators have already met and determined that Porrata would not even get an interview to be the Palisades H.S. wrestling coach for the 2014-2015 season.

Porrata argues that the court should not place "much significance" on the administrators' resistance to re-hiring him because the Palisades School Board ultimately decides who is hired as the wrestling coach and he has the full support of the parents of the Palisades H.S. wrestlers. Pl.'s Br. at 35. He also asserts that if the court issues the injunction, "the attitude of the administration today may not be the one that prevails when the hiring decision is made." *Id.*

Contrary to Porrata's arguments, while a majority of the School Board ultimately retains the final decision whether to extend an offer of employment to the wrestling coach, Porrata's application will not make it to the School Board for the members' consideration because the administrators have decided not to interview Porrata. The School Board has never overruled a decision regarding a candidate during Heffernan and George's tenures as principal and athletic director and there was no evidence presented during the hearing that (1) the wrestling parents' support of Porrata would change the administrators' decision not to interview Porrata, or (2) the School Board was going to require the stakeholders committee to interview Porrata. Thus, the

record showed that the administrators' decision not to interview Porrata would stand and the stakeholders committee would not interview him for the position.

Additionally, the Palisades administrators demonstrated an unequivocal determination that their viewpoints on Porrata would not change in the immediate future.  More specifically, both George and Heffernan indicated that the PIAA sanctions did not factor in their decision not to have the stakeholders committee interview Porrata.[10]  Instead, they considered a variety of factors when deciding not to interview Porrata, and they testified that even if the sanctions were not in place, they would not have interviewed Porrata because of his dishonesty towards them and his overall lack of credibility.  Therefore, Porrata cannot show that there was any chance that he would be interviewed (or subsequently hired) for the position of Palisades H.S. wrestling coach even if the sanctions were not in place.  Accordingly, Porrata cannot demonstrate irreparable harm insofar as he alleges that he will be irreparably harmed by the sanctions affecting his ability to interview and have the Palisades School District consider his application to be the head wrestling coach for the 2014-2015 season.

In addition to his initial contention relating to his desire to have Palisades H.S. rehire him as coach, Porrata asserts that he will suffer irreparable harm because the PIAA sanctions essentially constitute a "fatal, statewide bar to his employment prospects."  Pl.'s Br. at 35; *see* Pl.'s Proposed Findings of Fact and Conclusions of Law at 33, ¶ 77, Doc. No. 12.  He contends that "[e]very day on which the PIAA sanctions remain in effect is a day on which [he] faces an insurmountable hurdle in obtaining employment as a high school wrestling coach at a PIAA member school."  Pl.'s Proposed Findings of Fact and Conclusions of Law at 33, ¶ 78.  In

---

[10] The court recognizes that George's March 27, 2014 letter and Dr. O'Connell's March 31, 2014 letter referenced the PIAA's sanctions as being related to Palisades' decision not to renew Porrata's contract with the school.  *See* Pl.'s Exs. 21, 22.  Nonetheless, the court found credible both George's and Heffernan's testimony that the sanctions did not play a role in their decision not to interview him for the position.

response to these arguments, the PIAA argues that the sanctions do not prevent Porrata from coaching at any school because the sanctions only relate to post-season activity and are limited to the 2014-2015 season.  Def.'s Br. in Opp. to Pl.'s Mot. for Prelim. Inj. at 17, Doc. No. 8.  Additionally, the PIAA claims that Porrata failed to present any evidence that the PIAA sanctions are a factor in the hiring decision of any other school, and Porrata's "evidence on irreparable harm was limited to subjective fear of possible harm, is speculative, and addresses only possibilities, without actual evidence supporting his fear."  Def.'s Proposed Findings of Fact and Conclusions of Law at 23, ¶¶ 122, 123, Doc. No. 11.

The court agrees with the PIAA that Porrata failed to introduce any credible evidence that the PIAA's sanctions have had or will have an effect on his potential employment opportunities as a wrestling coach and that monetary compensation could not atone for it.  At the time of the hearing, Porrata testified that he had submitted applications for employment as a wrestling coach at one school (Liberty High School) other than Palisades H.S.  He also was in the process of applying to a couple of other schools.

Porrata did not present any evidence that the PIAA sanctions currently in place for the 2014-2015 season are having any effect on his application to be a coach at Liberty High School or at any other school.  In addition, Porrata did not present any evidence to support his assertion that the PIAA's sanctions are operating as a statewide bar to his employment prospects as a wrestling coach.  In this regard, Porrata is speculating that every PIAA school to which he would apply to serve as the head wrestling coach would have post-season aspirations (either as a team or as to certain individual wrestlers) for the 2014-2015 wrestling season.  He did not introduce any evidence that a school without post-season aspirations would not hire him as its wrestling

coach because of the PIAA sanctions.[11]   The uncontradicted testimony presented during the hearing demonstrated that Porrata did a tremendous job at turning around a Palisades H.S. wrestling program that had been very unsuccessful – in terms of its record and number of wrestlers participating in the program – prior to his arrival there.   Although admittedly there was no evidence on this point, it is equally possible that a school in a similar situation to Palisades H.S. prior to Porrata's arrival would be interested in hiring him to use his extensive experience to change the fortunes of that school's wrestling program.   Even when considering schools outside of the PIAA, Porrata did not introduce any evidence showing that the sanctions would preclude him from obtaining employment at a non-PIAA school with a wrestling program or at another location, such as a New Jersey school.   Therefore, the record presented in this case does not support Porrata's assertions that the PIAA's sanctions operate as a "statewide ban" or an insurmountable hurdle in his goal to obtain employment as a wrestling coach for the 2014-2015 season.

In addition, Porrata has failed to demonstrate that his inability to obtain employment for the 2014-2015 wrestling season, to the extent that he could show that the PIAA wrongfully imposed the sanctions in this case, could not be compensated by money damages after a trial. Although Porrata argues that he has suffered and will suffer a loss of reputation because of the PIAA sanctions (and apparently, the PIAA and the Committee members' wrongful characterization of his conduct during the Bethlehem Catholic match on January 30, 2014), Porrata did not introduce any credible evidence that he has suffered or will suffer a loss of

---

[11] While the court acknowledges that common-sense dictates that a school with individual or team post-season aspirations might not hire Porrata for the 2014-2015 season because of the effect of the sanctions on the team and the individual wrestlers, he did not offer any evidence that a school has or will deny his employment because of the sanctions.  As indicated above, all of Porrata's actual evidence on this issue pertained to Palisades H.S., and the record demonstrates that George and Heffernan's decision not to interview Porrata was wholly unrelated to the sanctions themselves.

reputation if the PIAA sanctions remain in effect. Porrata has not demonstrated a "clear showing of immediate irreparable injury" through any present or future loss of reputation and his claim is purely speculative. *See Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (indicating plaintiff's burden to show irreparable injury to support issuance of preliminary injunction (quotation omitted)).

For his final argument in support of his claim that he will be irreparably harmed if the court does not issue a preliminary injunction, Porrata contends that it will be impossible to calculate his damages for the loss of employment for the 2014-2015 season and the effects of the sanctions and the loss of that one year of coaching on any wages he would receive in future employment. Pl.'s Br. at 35-36; Pl.'s Proposed Findings of Fact and Conclusions of Law at 34, ¶¶ 81-82. Contrary to this claim, the court finds that it is possible to calculate his damages if he was able to prevail on his causes of action in this case. This is precisely the type of evaluation and testimony that a vocational expert could testify to at the time of trial.

Accordingly, for the reasons set forth above, Porrata has failed to demonstrate a clear showing of irreparable injury in this case and the court will deny the motion for preliminary injunctive relief.

## VI.   CONCLUSIONS OF LAW

1.      To support the issuance of a preliminary injunction, a plaintiff must demonstrate a "clear showing of immediate irreparable injury . . . or a presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (internal citations and quotations omitted).

2.      The "risk of irreparable harm [also] must not be speculative."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) (citation omitted).

3.      If the threatened harm is compensable with money damages, a petitioner seeking preliminary injunctive relief has not demonstrated irreparable harm and the court should not issue a preliminary injunction.  *See Frank's GMC Truck Ctr., Inc. v. G.M.C.*, 847 F.2d 100, 102-03 (3d Cir. 1998) ("The availability of adequate monetary damages belies a claim of irreparable injury.").

4.      Porrata has not demonstrated a clear showing of immediate irreparable injury that could not be compensated by money damages or other legal relief if he were to prevail at trial in this matter.

5.      Regarding Porrata's desire to continue as the head coach of Palisades H.S., Porrata has not demonstrated a clear showing of immediate irreparable injury because the Palisades H.S. administrators, in particular George and Heffernan, have determined that they will not interview Porrata for the open coaching position and this decision not to interview him is unrelated to the PIAA's sanctions.

6.      Porrata's claims of irreparable injury with regard to (1) his alleged inability to obtain employment as a wrestling coach at another PIAA member school, or (2) the alleged damage to his reputation, are purely speculative and do not entitle him to preliminary injunctive relief.

7.      Porrata's alleged injuries can be compensated by adequate monetary damages if he were to prevail at trial.

8.      Porrata has failed to demonstrate that he is entitled to the issuance of a preliminary injunction.

An appropriate order follows.

BY THE COURT:


*/s/ Edward G. Smith*
EDWARD G. SMITH, J.